# MINNIE HUNTER et al. v. THEODORE BRIGGS and ANNA CUNNINGHAM, Appellants.

### Division One, January 3, 1914.

1. **MENTAL INCAPACITY: Evidence: Opinion of Witnesses.** Nonexpert witnesses must first state the facts within their knowledge upon which they base their opinions of the mental condition of the deceased whose deed it is sought to have set aside on the ground of a lack of mental capacity to make it, before such opinions are admissible in evidence; but if they specifically state those facts and their reasons for their opinions, it is not error to permit them to state their opinions.

2. ————: **Conveying Property Without Trust or Payment: Eccentricity: Natural Mental Weakness: Instability in Business Affairs.** Deceased all his life was nervous and excitable, easily angered, and considered odd and eccentric, was a man of less intelligence than the ordinary man, and was unstable in his opinions and inconstant in his business obligations; he would make agreements, and without apparent reason break them; would refuse to do reasonable and sensible things, and after a pleasant conversation would be pliable and agreeable and then do more than had been requested of him. He had been married four times and had seven children prior to his marriage to his last wife, by whom he had none. Before his marriage to her, as a consideration therefor, he conveyed to her forty acres of his farm, and that and the balance of over eighty-three acres he and she, by a warranty deed in the usual form, reciting a consideration of $2400, which was never paid, conveyed to a stranger in blood. At that time he was about seventy-two years of age, and had shortly prior thereto been physically injured and had not recovered. A few months prior to that time he had started to town a short distance away where he had gone once or twice a week for his mail for forty years; he lost the way, and when told the right way was unable to follow it, and when he finally reached the town said he had spent the night in the brush (which was not true) and must have been crazy. Some of his neighbors, basing their opinions upon facts within their own knowledge, testified that he was of unsound mind and had been for years. He committed suicide by taking carbolic acid a few months after he had made the deed, by which he practically stripped himself of property. Prior to making it he was willing to sell the land for $20 an acre, which was five dollars an acre less than he thought it worth. After his death the grantee in the deed

executed a contract in which he bound himself to support as a member of his family for her life the wife of deceased, and impressed upon said land the burden of her maintenance. *Held*, that the decree of the chancellor setting aside said deed at the suit of the grantor's children should be upheld, on the ground that he did not possess sufficient mental capacity to make it.

3. ——: **Stripping One's Self of Property.** The act of an old, sick and crippled man in conveying away all his property without any consideration having been paid, and thereby making himself and his wife dependent for the rest of their lives, is not the conduct of an ordinarily sensible man, but is in keeping with the acts of a crazy man.

4. **TRUST: How Created: By Subsequent Contract Read Into Warranty Deed.** Where the owner of land makes a warranty deed conveying his land for a recited consideration which was never paid, a written contract signed by the grantee alone and made after the grantor's death, in which said grantee acknowledges an obligation to support the grantor's wife and impresses the land with the burden of her maintenance for life, is no evidence that the grantor conveyed the land to the grantee in trust for the use and benefit of his wife. Such a trust in lands cannot be created by parole, but must be evidenced by some writing signed by the party declaring the trust.

5. ——: **Oral Agreement.** An oral agreement creating an express trust in favor of the wife of the grantor in a deed cannot be established by parole testimony; such a trust can be proven only by some writing signed by the party creating it. Besides, if the grantor is dead, the other parties to the oral agreement cannot testify.

## Appeal from Linn Circuit Court.—*Hon. John P. Butler*, Judge.

AFFIRMED.

*Bresnehen & West* for appellants.

(1) If Isaac S. Cunningham had sufficient mental capacity at the time of making the deed in question to understand the nature and effect of the transaction, the deed cannot be set aside on the ground of mental incapacity. Chadwell v. Reed, 198 Mo. 379; Cutler v. Zollinger, 117 Mo. 103; Maddox v. Maddox, 114 Mo. 44;

Hughes v. Rader, 183 Mo. 703; Riggin v. Westminster College, 160 Mo. 579; Cash v. Lust, 142 Mo. 630; Hamon v. Hamon, 180 Mo. 701; Story v. Story, 188 Mo. 110; Von De Veld v. Judy, 143 Mo. 368. The law does not require that a man be a good business man, nor a good trader, nor that he exercise a wise and sound judgment, in order to make a valid contract. His intelligence may not be equal to that of the ordinary man, his faculties may be impaired by age or disease, and he may exercise a very unwise judgment, yet if he is able to understand what he is doing and the nature and effect of the transaction, his contract is valid and binding. (2) The burden is on the plaintiffs to prove undue influence. Studebaker v. Cofield, 159 Mo. 612; McKisson v. Groom, 148 Mo. 467; Bonsal v. Randall, 192 Mo. 531; McKinney v. Hensley, 74 Mo. 332; Crowson v. Crowson, 172 Mo. 702; Wood v. Carpenter, 166 Mo. 481. Where a confidential or fiduciary relation exists between a testator of weak mentality and one to whom he leaves a large share of his estate the law presumes that the will was procured by undue influence, but no such presumption arises where the favored beneficiary is a member of the immediate family of the testator and there is no evidence of any influence existing except such as acts of love and kindness are calculated to inspire. (3) Undue influence is such an influence as amounts to overpersuasion, coercion or force, destroying the free agency and will power of the person influenced, and causing him to act in subjection to the will of him who exercises the power. Hughes v. Rader, 183 Mo. 708; McFadin v. Catron, 120 Mo. 275. (4) Mere opinions of nonexpert witnesses to the effect that the deceased was not of sound mind or was incapable of understanding a business transaction, unaccompanied by any testimony showing any particular act or fact evidencing incompetency, is entitled to no weight whatever. Huffman v. Huffman, 217 Mo. 230; Hughes v. Rader, 183 Mo. 704; Wood v. Carpenter, 166

Mo. 487; Riley v. Sherwood, 144 Mo. 364; Sehr v. Lindeman, 153 Mo. 288. (5) This court is not bound by the finding of the trial court. Richardson v. Smart, 152 Mo. 637; Chadwell v. Reed, 198 Mo. 359; Hamilton v. Armstrong, 120 Mo. 629.

*C. C. Bigger* and *A. W. Mullins* for respondents.

(1) The deed of conveyance from Isaac S. Cunningham and his wife, to Theodore Briggs, is in form a deed of bargain and sale with covenants of general warranty, with a recited consideration of $2400, in hand paid to the grantors by the grantee, and the assumption by him of the payment of $100, mortgage indebtedness then against the land. In this regard the defendants' answer is that Briggs did not buy the land, but that said deed was made to him to hold the title to the land in trust for the use and benefit of said Anna Cunningham. On the trial the defendants offered themselves as witnesses to prove that at the time said deed was made ''an oral contract was made between the grantor and grantee in that deed, to the effect that Theodore Briggs should hold this land in trust to the use and benefit of Anna Cunningham, and that after the death of Isaac S. Cunningham the land was to be conveyed by Briggs to Anna Cunningham in execution of that trust.'' Said offer of proof was declined by the court and the evidence excluded. The ruling of the court in effect was correct. Sec. 2868, R. S. 1909; Hillman v. Allen, 145 Mo. 638; Rogers v. Ramey, 137 Mo. 598; Price v. Kane, 112 Mo. 412; Crawley v. Crafton, 193 Mo. 421; 1 Perry on Trusts, sec. 79. (2) The transaction itself, whereby Isaac S. Cunningham, his wife joining with him therein, conveyed to Theodore Briggs by deed of general warranty the farm owned by Cunningham, the same being all his real estate, and possessed of very little personal property, and owing some debts, without receiving any consideration whatever therefor, and without the creation of any trust

connected therewith, furnishes indubitable evidence that Cunningham was mentally incapacitated to make such contract, or that he was unduly influenced to make such deed. Dickson v. Kempinsky, 96 Mo. 252; Cadwallader v. West, 48 Mo. 483; Martin v. Baker, 135 Mo. 495; Gay v. Gillilan, 92 Mo. 250; Jones v. Belshe, 238 Mo. 524; Ennis v. Burnham, 159 Mo. 494. (3) If Cunningham was not unduly influenced to make the deed to Briggs, then it is manifest that he did not possess sufficient mental capacity to make it. Cunningham certainly did not understand and comprehend the nature and effect of his deed to Briggs; that it absolutely passed from him the title to all the land he then owned, and thus stripped him of nearly all the property he possessed, and this, too, wholly without consideration, and without any valid obligation resting on Briggs with respect to said land. Such deed ought not to stand. (4) The defendants' answer set up that the deed from Cunningham and wife to Briggs, "was made to Briggs, as trustee for the use and benefit of Anna Cunningham, the wife of said Isaac S. Cunningham." This warranty deed from Cunningham and wife to Briggs conveyed absolutely and unconditionally not only the 79 or 80 acres Cunningham owned—all his land—but also the 40 acres Cunningham had given his wife (then Anna Barnes), to marry him. The case shows that Briggs paid nothing whatever, not a cent, for the land. It is obvious that Briggs and Mrs. Cunningham conspired and confederated together to obtain from Cunningham the deed to his farm to Briggs, without consideration, and by fraud and deception, and because of his disordered mind and want of sufficient capacity to know and understand the nature of the deed and its effect, he was induced to make and did execute it.

WOODSON, P. J.—The plaintiffs instituted this suit in the circuit court of Linn county against the de-

fendants, to set aside and for naught hold a certain warranty deed executed by Isaac S. Cunningham and his wife, Anna Cunningham, the former deceased and the ancestor of plaintiffs, conveying to the defendant Briggs certain tracts of land therein described.

The trial resulted in a decree of court in favor of plaintiffs, setting aside said deed, and the defendants duly appealed the cause to this court.

No objection is urged against the petition, which charged mental incapacity of Cunningham to make the deed, and undue influence exercised over his mind by defendants, his wife and Briggs.

The answer of the defendants was as follows (formal parts omitted):

"Now come the defendants in the above entitled cause, and for their answer to plaintiffs' first amended petition herein, admit that the plaintiffs are the children, and that the defendant, Anna Cunningham, is the widow, of Isaac S. Cunningham, who died intestate in Linn county, Missouri, on the —— day of ——, 1908.

"Defendants further admit that on and prior to July 7, 1903, said Isaac S. Cunningham was the owner of all the real estate mentioned and described in the petition, and that on said date he conveyed to the defendant Anna Cunningham, who was then Anna Barnes, forty acres of said land, to-wit, the west half of the west half of the northwest quarter of section 5, township 58, range 18, Linn county, Missouri.

"Defendants further admit that after the conveyance of said land by the said Isaac S. Cunningham, to the said Anna Barnes, the said Isaac S. Cunningham and the said Anna Barnes were married, and defendants further state the fact to be that from that time on until the death of the said Isaac S. Cunningham, the said Isaac S. Cunningham and the defendant, Anna Cunningham, were husband and wife and lived together as such.

"Defendants further admit that on the —— day of —— 19—, said Isaac S. Cunningham and the defendant Anna Cunningham, by their warranty deed of that date, conveyed to the defendant Theodore Briggs the following described lands, to-wit: Seventy-nine and eighty-three one hundred acres in Lot One, and two and seventy-three one hundred acres in Lot Two, all in the northwest quarter of section 5, township 58, range 18, Linn county, Missouri, and that said deed further conveyed to said Briggs the forty acres of land theretofore conveyed by the said Isaac S. Cunningham to the said Anna Barnes.

"Defendants deny that at the time of the execution of said deed the said Isaac S. Cunningham was, by reason of his feeble bodily and mental condition, incapable of making or understanding a contract or making a valid conveyance of his real estate, and deny that he, the said Isaac S. Cunningham, was caused to execute said deed because of overpersuasion or any improper or undue influence on the part of the defendants or either of them; and defendants state the fact to be that said Isaac S. Cunningham at the time of the execution of said deed was of sound mind, capable of fully understanding the nature of the contract he was making, and that said deed was made by him without any persuasion or improper or undue influence on the part of these defendants or either of them, and that said deed was made to the defendant Theodore Briggs, as trustee for use and benefit of the defendant Anna Cunningham, the wife of said Isaac S. Cunningham.

"Defendants further admit that after the death of said Isaac S. Cunningham, the defendant Theodore Briggs did convey said land to the defendant Anna Cunningham, and that on the same day the said Anna Cunningham conveyed said land back to the said Theodore Briggs, but the defendants state and aver the fact to be that at the time of the execution and delivery of said last mentioned deed a contract was made

and entered into between the defendants whereby the said Theodore Briggs contracted and agreed to support and maintain the defendant Anna Cunningham as long as she lives.

"Further answering the petition, defendants deny each and every other allegation in said petition contained, and having fully answered, ask to be discharged with their costs."

Counsel for defendants strenuously insist that the evidence contained in the record is insufficient to sustain the finding and decree of the court as to the mental incapacity of the deceased to make the deed, and that no undue influence whatever was exercised over his mind by the defendants. Unfortunately this character of defense always calls for an extended consideration of all the evidence in the case.

The evidence is voluminous, covering more than a hundred pages of printed matter; and after carefully reading the same and comparing it with the statement of the case made by counsel for appellants, we find that they have correctly stated the substance thereof as introduced by counsel for both sides, which we will copy largely from, without giving credit for same, as we may add to or subtract therefrom, as we deem just and proper.

## PLAINTIFF'S EVIDENCE.

*Doctor J. L. Cantwell* testified: That he had known the deceased for twenty-five years or more and had prescribed for and treated him occasionally during all that time. The deceased was getting along in years and was more or less debilitated; he considered him physically weak and on the decline and suffering from senile changes. Witness had moved away from this county in 1906, and had not seen the deceased since that time. When he last saw the deceased in 1906, he did not think he would have been able to transact any

complicated business, but that he was as able to understand ordinary affairs as most men of his age.

*John Switzer* testified: That he was twenty-one years old and had known the deceased all his life. On one occasion early in March, 1906, he met the deceased at Ot Colsen's, who lives about two and one-half miles northeast of St. Catherine. Witness was going to Brookfield the next morning, and deceased came down there from his home on horseback, intending to walk from there next morning to St. Catherine, and there take the train to Brookfield. They agreed that they would go to Brookfield together the next day. The next morning the deceased got up about six o'clock while breakfast was being prepared and left for St. Catherine on foot without saying anything to anyone about it. When witness got to St. Catherine deceased had not come, but the train was due at 11:10, and deceased arrived about a half hour before train time. When deceased arrived he was tired out; he said it looked like he ought to know where everybody lived, but he didn't, and he did not say what caused him to lose his way. Deceased lived about four miles north of where he stayed all night, and was familiar with the road to St. Catherine and the way across the fields. The mental and physical condition of the deceased was just about what would be expected of a man of his age. He looked after his stock and farm and took about the same care of them as his neighbors took of theirs, and conducted his business about as well as his neighbors conducted theirs. Witness said that he guessed the deceased had capacity to manage all of his ordinary affairs.

*Laura Colsen* testified: That she was a sister-in-law of the deceased by his third marriage. She lived with her son Ot Colsen and was at his house on the occasion when deceased and John Switzer came there and stayed all night. Deceased talked quite a bit that evening; he was restless, was always restless; and it seemed to grow on him as he grew older. She saw him

the next morning as he came down and got his coat and
went to the kitchen and went out; her daughter spoke
to him and he seemed to be in a hurry and flustered up
and only stayed in the house a few minutes; he was
always a very restless man and very crabbed and cross.
There wasn't a great deal of change in his conduct and
mental condition in the latter years of his life. In her
opinion the deceased was incapable of transacting busi-
ness and comprehending his affairs for several years
back; she didn't think he was capable of anything
hardly; you could not content him with any one sub-
ject; he was not very smart and she didn't think he
ever was; he always rented out his farm and worked
by day's work for somebody else, and she didn't think
any smart man would do that.

*Fannie Colsen* testified: That she was Ot Col-
sen's wife and thirty-one years old. On the morning
he left their house for St. Catherine he came down like
he was perfectly excited about oversleeping himself; it
was daylight when he came down. She said to him,
"Why, Uncle Ike, why didn't you wait? I would call
you for breakfast;" he seemed kind of excited about it
and wanted to know about her brother (Switzer) being
gone. She told him he was not gone and that her hus-
band was out feeding, and he walked out and that was
the last she saw of him until he came back from Brook-
field. She then asked him what made him go off before
breakfast, and he said, "I guess I taken a crazy fit and
went off and got lost, and I don't know what time I got
to town." Deceased never seemed like a man capable
of doing business. She was at his house the morning
after he died and had a conversation with his widow,
in which witness said, "Aunt Anna, it seems as though
Uncle Ike's mind wasn't right or he wouldn't have
taken carbolic acid," and the widow replied, "No, I
have noticed that papa's mind wasn't right for a long
time." The widow said to her and Minnie Hunter, the
next morning, "I have noticed papa hasn't been right

since Mr. Maddox beat him out of that money.'' Maddox beat the deceased out of some money about two years ago. The morning deceased went to St. Catherine, they got up late and it was almost sun-up when he left. When he came back from Brookfield he explained that he had got lost on his way to town. She did not think it unusual or improper for him to transact ordinary business, but she did not think he was able to transact business of a complicated nature. He also rented his farm on the shares, and worked for others. He took carbolic acid, and in her opinion nobody of sound mind would take carbolic acid. On one occasion her father and uncle tried to buy some bees of him and offered him five dollars a stand for the bees, which was a reasonable price; he wouldn't sell them, but when corn planting time came he came down to their house for a bushel of seed corn, and she offered to trade him a bushel of seed corn for a stand of bees, and he made the trade. In her opinion he never was a man of sound mind; that is, he wasn't a good trader.

*Ot Colsen* testified: That in his opinion Mr. Cunningham in the latter years of his life was not capable of transacting any complicated business. On one occasion deceased wanted a cow that was giving milk, and wanted his son to trade for one; witness offered to trade him a young cow for two, an old cow and a heifer, and give him five dollars to boot. When he and the boy first told the old man about the trade he got mad and thought they were trying to swindle him; but when they told him what kind of a cow witness had he became satisfied and gave the boy $2.50 for making the trade. On another occasion witness bought one hundred bushels of corn from him at forty cents a bushel, which was the market price; he hauled one load and then said he couldn't spare any more; afterwards deceased came to him and told him he could have the balance of the one hundred bushels; and in the meantime the price of corn had advanced five cents on the bushel.

*John Pankey* testified: That he lived three and one-half or four miles northwest of St. Catherine. One morning in March, 1906, the deceased came to his barn lot about eight o'clock in the morning and asked to be directed the way to St. Catherine. To get to his place from Ot Colsen's, deceased would have crossed the public road that he ordinarily travelled in going to St. Catherine. It did not seem that he was of sound mind at that time. The only thing that caused witness to suspect that he was not all right was the fact that he had got lost on the way to town. Ordinarily deceased would go to St. Catherine on horseback or in the wagon, but this time he was on foot.

*P. L. Limeberry* testified: That he had been acquainted with the deceased since 1868. He was always a nervous man and peculiar, and as he grew older he broke down mentally and physically, and from his observation deceased was not of sound mind. Deceased might have been able to understand and transact some kinds of business in 1906 and 1907, but others he would not. He was a man easily influenced. You would go to him for anything, and he would tell you "No" blunt, and talk with him a few minutes and he would give you more than he was able. Witness and deceased were good friends, and witness would sometimes go on his note for money and was on his note when he died, and had been for years. Deceased attended to his ordinary business, but he did not consider him a good business man. Sometimes he made bad trades. In 1902 or 1903, witness bought five or six head of cattle of him and paid the market price. Deceased was able to make that trade and capable of attending to ordinary business.

*J. C. Schreckise* testified: That he lived three-quarters of a mile from where Mr. Cunningham had lived, and had known him ever since the war. He was a nervous, excitable man, taking notions and changing his mind. He had a small piece of timber that he sold

to the witness two or three times, and the witness would cut some of it down each time and the deceased would stop him and swear he could not have any more. At times deceased seemed to be perfectly rational and at other times he did not seem to be. One thing that made witness think he wasn't always of sound mind was with reference to a five dollar balance that was owing him by witness's nephew and partner in the mill business on a calf deal. The old man took a notion it was witness who owed him this five dollars. Witness said to him, "Mr. Cunningham, Harvey Williams is administrator on that. Go over there and get it." Deceased turned around and went to cursing him and told him to get out of the yard, and he just went off laughing. His wife said to him: "You're going to get into it. What was the matter?" and he said to his wife, "The old man is having one of his tantrums is all."

*Robert Schreckise* testified: That deceased was a nervous and excitable man, and would change his mind frequently. When witness would go to his place sometimes he would be in the best of humor, and other times he would start for the house mumbling and would not talk to him. These peculiarities increased as he grew older, and in his opinion he was not of sound mind, especially in the latter years of his life. Sometimes when he would go over to Mr. Cunningham's he would talk to him and ask him in like a man, and other times he would walk away mumbling and swearing and have no conversation. Upon one occasion deceased said, "What the devil do you want here?" and the witness turned around and went back.

*Wesley Harper* testified: That he was a rural mail carrier out of St. Catherine and delivered mail to the deceased. Sometimes his brother, Robert Harper, would carry mail as his substitute, and sometimes the deceased would call him Robert instead of Wesley.

*Earnest Schreckise* testified: That he was a son of Clinton Schreckise and had lived in the neighborhood of the deceased all his life. On one occasion shortly before Mr. Cunningham died, he wanted witness to come down the next day and split some wood and put up some lead troughs. He told him he might have to work for his father and might not be able to come, and the next day he hired witness's brother to do the same work, without saying anything to the brother about having hired him to do the same work. Some days the deceased would not know which one of the Schreckise boys witness was. Sometimes he would go there and the old man would treat him nicely, and sometimes he would not say much, and he didn't think the deceased was able to transact business.

*Walter Schreckise* testified: That he was another of the seven Schreckise boys. He had worked a good deal for the deceased, and at meal time the deceased would say, "Go on to supper," that he didn't care for any, and after the other folks had sat down the old man would come in and eat as hearty a supper as any of them. On one occasion he went there to get some seed corn, the deceased said he didn't have any to spare, and they talked a while, and the deceased then said that he could have the corn and told him to go down to the crib and help himself. In his opinion the deceased wasn't of sound mind, particularly during the latter years of his life, and he didn't think he was capable of fully understanding, comprehending and transacting business during the latter years of his life.

*Walter Carter* testified: That he had lived in the neighborhood of the deceased for thirty-five years; had lived about a half mile from his place, and had known and neighbored with him all that time. Saw him frequently during that time, sometimes twice a day and talked to him frequently. Had business with him on different occasions. Along in the summer before he died the next May, witness sold his boy, Orlando, a

horse, for which the boy gave his note. Witness asked
the boy to have Mr. Cunningham sign the note and he
did. The note was given the first of July and was to
run six months. Along after harvest deceased became
a little uneasy; he was catching rumors that his boy
was going to skip out and leave him to pay the note.
Deceased would go to witness to-day and they would
talk it over and it would be all right, and to-morrow he
would go back again. He was scared, he thought he
was going to lose that money. Witness said to him,
"Mr. Cunningham, you don't need to be uneasy; the
boy has a crop on your place"—corn, wheat, two
horses and hogs that witness knew of at the time.
Finally witness had to go and cancel the note after
harvest. From all witness saw of him and was able
to observe, he didn't think deceased was a man of sound
mind. He changed his mind frequently and was ex-
citable. Deceased had told him he was about seventy
or seventy-two years old, he always took him to be
older than that. Sometimes he would say he was so
old, and sometimes he would say he was ten years
younger. When he gave that note witness knew de-
ceased was good pay and gave no consideration to
whether or not he had sufficient mental capacity to
make a contract. He thought deceased was of sufficient
mind to sign a note as surety for the boy. He did
not think deceased was crazy. It is his opinion that de-
ceased had sufficient mind to transact ordinary busi-
ness at times. In settling up this note, witness was up
there and he wanted to trade him out of that note and
witness said, "All right, what have you got to trade
with?" He had a couple of colts which he said he
would trade witness for the note, but witness says,
"There ain't no use, Aunt Anna wouldn't let us trade."
We were all sitting there. She sat there a few minutes
and directly she said, "If you all want to trade, go
ahead and trade." Witness says, "All right, I will go
and look at the colts." When witness got back from

seeing the colts they concluded he would have to see the boy and see if it was all right with him and if he would pay the money. He saw the boy who said it was all right, but when he came back the trade was all off. The colts were worth just about $100, so it was a reasonably good trade from the old man's standpoint. He seemed to understand the value of the colts.

*James Sullivan* testified: That sometimes when he would see the deceased he would seem friendly and glad to see him, and maybe the next time he wouldn't have much to say.

*Ray Pankey* testified: That he is a son of John Pankey, and remembered the occasion when deceased came to their house one morning in March, 1906. He came up to the barn from the east. Witness did not know him, and sent for his father. Deceased told witness who he was and inquired the way to St. Catherine, and witness pointed him back towards St. Catherine, and deceased turned around and looked that way. Witness pointed out Mr. Lapping's house, which was southeast of their place and told him to go to that house, and there he would find the road to St. Catherine. He started off that way and went down the lane south of the barn, and when he got to the end of that lane he turned to the right and went over towards Mr. Newman's house. That was a foggy, cloudy morning; you could see, but it was cloudy and a little foggy.

*George W. Nester* testified: That he was a notary public and justice of the peace and had been a member of the county court. He had known the deceased twenty-five or thirty years, and lived about three and one-half miles north of him. He was administrator of the estate of the deceased and took an inventory of the estate at the home of deceased some five or six weeks after he died. Among the persons present at the time were the widow, C. G. Gardner, George W. Coffman and Obediah Brown. While they were taking the in-

ventory, Orlando, the youngest boy, asked the widow, "What did you do with the money that Briggs paid you for the land?" She answered, "That money is all right." Witness had talked to deceased frequently about business matters, and had transacted some business for him. The last time witness saw him was the 5th day of May, prior to his death on the 24th of that month. He was sitting close to the door when witness rode up, and says, "George, I can't come out this time; I got hurt with a colt and can't come out." He had his wife hand witness some pension papers, and says, "My hands have got so stiff I can't write my name; you will have to write my name, fix it in there, and Mr. Limeberry and his wife will witness it when you go down to his house." He had never heard his soundness of mind questioned; had noticed no difference in his condition the last two or three years before he died from what it was prior to that time, except that he seemed to be getting a little older. He never saw anything in his condition to suggest that he was not of sound mind. He certainly was competent to understand the nature of an ordinary business transaction during all that time, and was capable of understanding the nature of a deed conveying his property to Theodore Briggs for the use of his wife. Never heard the soundness of his mind questioned until after his death. As administrator of the estate witness brought a suit against Briggs for $2400, the consideration mentioned in the deed.

There was undisputed evidence to the effect that deceased upon the occasion of going to St. Catherine, about three miles, on his way to Brookfield, became lost and wandered over the country from about six o'clock in the morning until almost eleven; and instead of going southeast to St. Catherine he went more than three miles northwest thereof, notwithstanding the fact that he had lived right there for forty years or more and was perfectly familiar with the entire country there-

about. That finally he made inquiry of a neighbor of the way to St. Catherine, and after receiving the instructions to start off in that direction, and after going something like a half mile, he crossed the public road leading to that place and then went almost in the opposite direction.

That a few weeks prior to his death he drank carbolic acid with suicidal intent, and finally died from its effect.

That he had been married four times, the last time to Anna Cunningham, one of the defendants. Prior to his marriage to her, he conveyed to her the forty-acre tract as a marriage settlement.

That the two tracts of land conveyed to Briggs by the deed mentioned was all the real estate the deceased and his wife owned.

That at the time of this conveyance Cunningham had a minor son living with him.

The deed which is sought to be set aside is an ordinary general warranty deed, conveying to Briggs the seventy-nine acres of land that belonged to Cunningham and the forty acres he had previously conveyed to his wife, for a recited consideration of $2400, which was never paid.

After Cunningham's death, the administrator of his estate sued Briggs for $2400, and thereafter and during the pendency of said suit he conveyed all of said land back to Anna Cunningham, his codefendant, and on the same day she reconveyed it to him, in consideration of the matters and things stated in a contract made and entered into by and between said Briggs and said Anna Cunningham, dated August 27, 1908, and recorded in the recorder's office of Linn county, which is fully set out in defendants' evidence.

That after the execution of this contract, if I correctly understand the record, the administrator dismissed his suit to recover said $2400, and the heirs of Cunningham instituted this one.

## DEFENDANTS' EVIDENCE.

*Doctor John M. Boyles* testified: That he is a physician, lived at Shelby, Linn county, Missouri, and had practiced his profession for about twenty-five years. He was acquainted with the deceased for three or four months before he died, and attended him during his last illness. He visited deceased eight, ten or a dozen times; attended him first for some injury he sustained from getting squeezed up in his barn with his colts; he was injured through the hips from which he suffered pain. Didn't engage in conversation with deceased about business matters; talked about common events; did not observe anything unusual about his condition mentally; nor anything indicating that he was not capable of knowing and understanding business transactions. He appeared reasonable and intelligent for a man of his age. Deceased told him he was seventy-two years old. He always regarded deceased as sound, sane and rational. Was called once in company with Doctor Evans, the time deceased had taken carbolic acid; that was about three weeks before he died. The reason deceased gave him for taking carbolic acid was that he was sick and out of heart and couldn't get well, and that he would end his life and get out of it. He said he was worn out, sick and couldn't get well, and in pain. He talked about it in a rational, sensible manner. After he drank that carbolic acid he was very solicitous to get well. Suicide is usually deemed by the medical profession as a symptom of insanity, but when witness talked to him and examined him his mental condition was as good as a man of his years usually is. He was rational, intelligent and sane, and always was when witness saw him. When a man or woman takes poison in an attempt to take life, it is generally said there is some mental aberration, some despondency or something of that kind.

*J. S. Lane* testified: That he was a neighbor of the deceased, and owned a farm of over seven hundred acres. Had known deceased twenty years or longer and was well acquainted with him. Had traded with him some. Saw him last the day he took the poison, shortly before he died. Saw him a week or two before he took the poison and talked to him. Think his mental condition was sound; it was sound as far as witness knew. Thinks he was capable of transacting ordinary business; never heard his mental condition challenged or questioned until after his death when this lawsuit was threatened. His word was always good. Witness traded with him two or three times. He always seemed to understand the value of the property he was trading. About two weeks before he died witness tried to buy a couple of colts. He wanted $100, and witness offered ninety-five dollars; it was two suckling colts, there was five dollars between them. He wouldn't knock off the five dollars and they didn't make the trade. Witness thinks he was a man that was positive, self-reliant and set in his ways.

*Obediah Brown* testified: That he was a farmer, and lived in the Cunningham neighborhood. Had known deceased twenty-five years. The post office, St. Catherine, is over west of his place and deceased passed his place often going to the post office. Saw him about four weeks after he was hurt; that was the last of February, or the first of March, 1908; saw him again about ten days after that. From his acquaintance with deceased his mental condition was as sound as it ever was; so far as witness ever heard until his death he was sound and sane on every question on which he talked to him. The first time he heard deceased's soundness of mind questioned was in the evening after he died in the morning; that was by George Colsen. In the latter years of his life he was about the same as before, only old age was overtaking him. Deceased talked with witness about the disposition of his

property the time witness saw him in the latter part of February or the first of March. It was after he got hurt. Mrs. Cunningham came to the door, and said Mr. Cunningham was not able to come out, and that he had been sick for a month, so witness tied his horse and went in and deceased talked to him about his sickness. Mrs. Cunningham was sitting there, and he turned his head towards her and called her by her first name and said she had been as kind to him as any mother could be to her child, and she should have everything that he had. She was not saying anything at the time, and as far as witness knows or ever heard of she was always kind, attentive and tender towards him.

*Charles Gardner* testified: That he had known deceased as far back as 1873, and continued to know him down to the time of his death. Had seen him frequently during all that time, and had some little business with him. In these transactions he seemed to be of sound mind like any other man; he wanted every nickel that witness ever owed him. From the knowledge, acquaintance and dealings of witness with him he was capable of knowing, appreciating and understanding ordinary business transactions such as making a deed or contract. Saw him only a few days before he died, not more than two or three weeks. His condition was about the same as it had been for the last twenty-seven years. Had never heard of any question or doubt as to his mental condition at any time until after his death.

*Theodore Hansman* testified: That he was engaged in the hardware and implement business at Bucklin; had been in that business twenty-one years; deceased traded with him more or less during all that time. The last time he saw deceased was in the fall of 1907; he frequently sold him goods on time; the last time was a wagon bed. He would come in and settle up his accounts; sold him the wagon bed in the fall of

1907. So far as witness could see his mental condition was good just as it had been. He had always been a little on the nervous order; was kind of quiet, and a little excitable. Couldn't see that his mental condition was any different in the fall of 1907 from what it had always been. He was capable of appreciating, understanding and transacting ordinary business. During all these twenty years he was growing older, but his way of doing business was just about the same as it always had been—about the ordinary way of the ordinary customer. He was a nervous man, and a little out of the order of most men. He was not what you would call a very composed man; seemed to have something on his mind. He was a little odd in that way; but he was that way as long as witness has known him. Couldn't see that it was more pronounced as he advanced in years. His general health seemed to be failing, but mentally he seemed to be about the same as he always had been.

*J. W. Rouse* testified: That he was a banker and lived at Bucklin; had lived there a little over twenty-one years. Knew the deceased and transacted some business with him; loaned him money occasionally, which he would pay. He died owing the bank a little, which was paid by his administrator. From his dealings and transactions with the deceased he never suspected anything wrong with his mind. Never thought of such a thing. He appeared to understand and transact his business in the ordinary way. He got a pension, and generally came down there to get the money. That would occur every quarter. He probably did that for six, eight or ten years. Sometimes he would borrow money from the bank and then renew the note.

*John Veal* testified: That he lived north of Bucklin about five miles; had known deceased since the fall of 1866 or 1867, and would see him frequently during all that time. Deceased's second wife was witness's sister; he had three children by her, two of whom are

still living. He and deceased were together a good deal, and had frequent talks and conversations. He did not see anything to indicate but what deceased was sound mentally, and never heard anything else until after he was dead. Thinks deceased was capable of knowing, appreciating and understanding ordinary business transactions, such as making a deed or contract. Never saw any difference in him mentally a year before he died as compared with what it had been for twenty or twenty-five years. Witness had several talks with him about the disposition of his property. He broached the subject to witness himself and told him he intended to give his present wife (Anna) what he had. Then probably a month before he died he told witness he had done it. He didn't say exactly how he had done it. He said she had stayed there and waited on him and took care of him, and the children had left him, and he intended that she should have what he had. He always seemed rational, intelligent and sensible, and witness never heard his mental condition questioned or doubted until after his death. He had been telling witness for two or three years before he died what he intended to do with his property. The last time he told witness what he intended to do was about four or five months before he died. After that he told witness he had done it. He told witness he had fixed it so she would get it.

*Anna Cunningham* testified: That she did not tell Fannie Colsen, after Mr. Cunningham's death, that Mr. Cunningham had been out of his mind or crazy; and that she did not say to Mrs. Fannie Colsen that he had been out of his mind and wrong ever since Maddox beat him out of some money; that she never mentioned such a thing to Fannie Colsen.

*Mayme Briggs* testified: That she is a daughter of Theodore Briggs, and was at the house of the deceased about two hours after he died; that she was there in the room with her stepmother and Mrs. Fannie Colsen all the time Mrs. Colsen was there on that oc-

casion, and that no such conversation occurred between them as that testified to by Mrs. Colsen with reference to the deceased being out of his mind or crazy. That she had known the deceased eight or nine years; talked to him frequently; and in her judgment he was of sound mind. Witness has known Mrs. Cunningham as long as she can remember; has been living close to them for several years. After Mr. Cunningham died Mrs. Cunningham came down to their house, and is still living there. Her father is taking care of Mrs. Cunningham, furnishing her whatever is necessary; she is living there as one of the family. There are nine of the Briggs children and all are pretty well grown up.

*Willa Briggs* testified: That she is a daughter of Theodore Briggs, and had known the deceased all her life. Their families were intimate and visited back and forth frequently. The deceased always appeared rational and of sound mind.

*Zack Pulliam* testified: That he had known Isaac S. Cunningham for twenty-five years, but had never had any particular acquaintance with him until the last five or six years. Never had any business transactions with him, but would see him often of late years at Mr. Bond's store, where he got his mail and did his trading. He regarded deceased as being a man of sound mind; he seemed to be capable of knowing and understanding transactions of business. He never heard any doubt expressed or question raised in regard to it up to the time of his death and afterwards. As far as witness ever heard, Mr. Cunningham transacted his ordinary business. He found out that witness had lived close to where his wife had lived and he talked quite a bit to witness about his wife, bragging on her. He also talked to witness about his experience in the war, and remembered and could relate what had occurred. He told witness he was seventy-one years old.

## REBUTTAL.

*Allen Newman* testified: That he lived about three miles northeast of St. Catherine and about a half mile from the farm of John Pankey; was living there in March, 1906. He saw the deceased at his father's place on the 21st of March, 1906; he came there in the morning about seven o'clock from the direction of Mr. Pankey's. He told witness who he was and said he was going to St. Catherine. He said he didn't know the way and wanted to be directed. He said he stayed over in the brush northeast of there. Ot Colsen's is about straight east, and there is some timber over there about his place. Mr. Cunningham said he was turned around, and he didn't know the way to St. Catherine and would like to have some one. take him. Witness directed him to go southeast, and he went. From what witness saw of him that morning and his appearance and talk he was not at that time of sound mind.

The contract between Briggs and Anna Cunningham, his codefendant, executed August 27, 1908, previously mentioned, and constituting the consideration for the execution of the deed of the latter to the former, is as follows:

"This contract, made and entered into this 27th day of August, 1908, by and between Theodore Briggs, party of the first part, and Annie Cunningham, party of the second part, both of Linn county, Missouri, witnesseth:

"That party of the first part, in consideration of the sum of twenty-four hundred dollars, paid by the conveyance to him by said second party of the land hereinafter described, does by these presents grant unto the party of the second part, for and during her natural life, the right and privilege of living upon and occupying with the family of the first party the dwelling house in which first party now resides or may

hereafter reside, and said first party does hereby charge the following described real estate with the keep, care and maintenance of said second party so long as she remains single and a member of his family, to-wit: Seventy-nine and eighty-three one hundred acres in Lot One; also thirty-eight and fifteen one hundred acres in Lot Two; also two and seventy-three one hundred acres of the west half of the east half of Lot Two; all in the northwest quarter of section 5, township 58, range 18, Linn County, Missouri, except three and one-half acres deeded to the trustees of the M. E. Church, South, September 2, 1882; the land conveyed being the same land conveyed to said Theodore Briggs by Isaac Cunningham and Anna Cunningham, his wife, by deed dated October 18, 1907, and recorded in the recorder's office of said county in book 165 at page 309.

"In witness whereof, the said party of the first part has hereunto subscribed his name and affixed his seal on the day and year first above written.

"THEODORE BRIGGS (Seal)."

(Then follows the acknowledgment.)

I. Counsel for appellants present three legal propositions for determination, viz.: First, that the court erred in admitting certain evidence over their objection; second, that there was no evidence introduced even tending to show, much less sufficient to support, the finding and decree of the court to the effect that the deed from Cunningham and wife to Briggs was procured by fraud and undue influence; and third, that the evidence introduced was insufficient to support the finding and decree of the court, to the effect that Isaac S. Cunningham was of unsound mind and incapable of making the deed in controversy.

We will dispose of these propositions in the order stated.

Regarding the first: Counsel for appellants objected to the opinions of several of the witnesses introduced by respondents, regarding the mental condition of Isaac S. Cunningham, and his incapacity to make the deed mentioned, for the reason assigned, that they had not sufficiently qualified to express such opinions.

**Nonexperts: Opinions.**

The law of this State is too well settled to admit argument that nonexpert witnesses must first state the facts in their knowledge upon which they base their opinions, before such opinions are admissible in evidence.

After reading the entire record and collating the substance of all the testimony introduced, as set out in the statement of the case, we are satisfied that each and all of the witnesses who gave their opinions as to the mental condition of the deceased, sufficiently stated the facts existing in their own knowledge, upon which they predicated such opinions to qualify them as witnesses in that regard.

All of them testified that they had known Cunningham personally for a great many years; had lived neighbors to him during the same time, and had observed his life and conduct from the time they first knew him, down to the date of his death.

Each and all of them stated the reasons why they thought he was of unsound mind; and while the specific reasons given by some of the witnesses for entertaining such opinions were not very persuasive, yet when taken in connection with their long and intimate acquaintance with him and their close observation of his life and conduct and his physical condition, extending over all those years, were sufficient to qualify them to testify in that regard.

Counsel for appellants recognized the correctness of that rule of evidence by introducing the same class of witnesses, and asking their opinions as to the mental condition of Cunningham, based upon facts no more

specifically stated than were those stated by the wit-
nesses· for the respondents.

We are, therefore, of the opinion, that the testi-
mony mentioned was competent and that the ruling of
the court in admitting the same was correct.

II. This brings us to the consideration of the
second proposition presented, namely: Was there any

**Undue
Influence.**

evidence introduced tending to show that
the deed from Cunningham and wife to
Briggs was procured through fraud and un-
due influence perpetrated upon and exerted over the
mind of Cunningham by the appellants?

I think not. Counsel for appellants have failed to
point to any evidence of that character, and after a dili-
gent search of the record, we have failed to find any
such evidence; and for that reason, if the decree of the
circuit court was based upon the charge of undue in-
fluence, it was clearly erroneous.

III. The third and last proposition presented is,
was the evidence introduced sufficient to support the

**Mental
Incapacity:
Sufficiency of
Evidence.**

findings and decree of the circuit court
upon the charge that Cunningham was of
unsound mind and was incapable of trans-
acting business at the time he and his wife
made the deed in controversy to Briggs?
This is by far the most difficult question for solution
presented by this record.

We will approach this question by first briefly stat-
ing the undisputed facts as shown by the record, and
then we will consider the testimony of the expert and
nonexpert witnesses on the question of insanity, in the
light of the facts which speak for themselves.

The following facts are undisputed:

The children and heirs of Isaac S. Cunningham
brought this suit to set aside and cancel the warranty
deed executed by him and his wife, Anna Cunningham,

one of the appellants, to Theodore Briggs, the other appellant, dated October 18, 1907.

This deed conveyed to said Briggs the eighty-three and a fraction acres of land described in the pleadings and evidence, which belonged to said Isaac S. Cunningham, and the forty acres mentioned belonging to said Anna Cunningham, for the recited consideration of $2400, which it is conceded was never paid.

This land was all the real estate owned by said Isaac S. Cunningham, which was his homestead and upon which he, his wife and a minor son of his, by a former marriage, resided.

The deceased had been married four times; the last time to Anna Barnes, one of the appellants, some four years prior to the date of the deed in question.

There were no children born of the latter marriage, but Cunningham was the father of seven children by the former marriages; said children being the plaintiffs in this case.

Immediately prior to the last marriage the deceased, as a marriage settlement, conveyed to the defendant, Anna Cunningham, *nee* Barnes, the forty acres of land owned by her and included in and conveyed by him and her to Briggs along with the eighty odd acres belonging to him, as previously mentioned.

He had no other means except a little personal property of not much value.

Cunningham was about seventy-two years of age and had been sick and feeble during the last few years of his life. Shortly before the execution of the deed in question, he received a severe personal injury by having been run against and mashed by some colts. He died some time in the early part of the year 1908, from the effects of carbolic acid taken with suicidal intent some three weeks prior to his death.

That shortly after the demise of Cunningham an administrator of his estate was duly appointed by the probate court of Linn county, who instituted a suit

against Briggs in the circuit court to recover said $2400, the recited consideration for said deed from Cunningham and wife to him.

That after the institution of that suit, said Briggs by deed duly executed conveyed said land to the said Anna Cunningham, his codefendant, and immediately thereafter and as a part of the same transaction, she reconveyed it back to him in fee, for the recited consideration stated in the contract made and entered into by and between them on August 27, 1908, as set out in the statement of the case, which in effect provided that he was to support and maintain her in his home, as a member of his family, so long as she remained single and chose to remain there.

That deceased was all his life nervous and excitable, and easily made angry, and as some of the witnesses testified, was considered odd or eccentric. He was not constant, but was somewhat despondent and very changeable, in his opinions, in business affairs, and somewhat in social conduct.

Cunningham had lived on this land for forty years or more, and knew the country thoroughly. St. Catherine, a small village, a few miles distant, was his post office, where he went once or twice a week during all those years for his mail. About one year prior to making the deed in question, he started from a neighbor's house, about six o'clock a. m., where he had remained over night, to go to St. Catherine to take the train to Brookfield.

He left without breakfast, in an excited condition, ignoring an engagement he had with his neighbor to go with him to St. Catherine, and lost his way and was compelled to inquire the way from two other neighbors; and after being directed, he again became confused and wandered about the country until almost eleven o'clock, just in time to take the train to Brookfield; and when asked what detained him so long, he

said he must have had a crazy spell and had stayed all night in the brush.

The deed from Cunningham and wife to Briggs was a straight warranty deed, containing no language whatever creating a trust in the land in favor of his wife, Anna Cunningham, as stated in the answer, or that the land was conveyed to him as a trustee for any purpose. That the first time the trust question was ever heard of was when Briggs conveyed the land to Mrs. Cunningham, and she reconveyed it back to him in consideration of his contract, dated August 27, 1908, to support and maintain her during the time she chose to remain in his house as a member of his family.

There was evidence tending to show that Mrs. Cunningham told some of the witnesses that Mr. Cunningham had been crazy or out of his mind for some time prior to his death; and that she tried to make some of the plaintiffs believe that Briggs had paid the $2400, recited in the deed, as the purchase price of the land, to her.

It was upon this state of facts, considered in connection with the testimony of the expert and nonexpert witnesses regarding the condition of the deceased's mind, that the trial court found for the respondents and rendered the decree accordingly.

Counsel for appellants, as previously stated, strenuously contend that this evidence was not sufficient to support the findings and decree of the chancellor; while upon the other hand, counsel for respondents, with equal earnestness, insists that it was ample in every respect.

In our opinion the evidence warranted the finding of the court, that the deceased was incompetent to make the deed in question, and our reasons for so stating are as follows:

In the first place, there is no question but what Cunningham was a man of less intelligence than that of the ordinary man; and practically all of the witnesses

agree that he was nervous, excitable and eccentric; and some of them stated that he was odd and did not act just as other men did.

The evidence also shows that he was fickle and changeable in his opinions and purposes, easily aroused and became angry and would curse his neighbors without provocation.

That in numerous cases his business transactions and social conduct were not in keeping with those of the ordinary man of intelligence.

That he would make a trade and "back out of it," before it was executed; and upon other occasions he would absolutely refuse to trade when a proposition was presented to him; he thinking that they were trying to swindle him, and in a few minutes he would make the trade upon terms more favorable to the other party than those offered by the other party in the beginning.

He sold some standing timber to one of the witnesses, and some corn to another, and in each case, without any excuse whatever, after a part had been delivered, he stopped the further delivery of each and later he told them to go on and cut the timber and haul the corn.

His social conduct, at times, was out of the ordinary. At times he was bright and pleasant and would converse freely with his neighbors, and then again he would become angry without provocation and would talk but little, and when he did, it would be to quarrel and fuss with them; and at other times he would sit around and have nothing to say to anyone.

Without provocation, he swore at and ordered one of the witnesses from his yard, and laughingly he (the witness) turned and went away, but shortly, within a few days, he returned as he had frequently done before, and deceased acted just as he had always done before, just as if nothing unpleasant had ever occurred.

Upon another occasion Cunningham got the idea in his head that his son was going to run away and leave him to pay a note for $100 he had signed as surety for the son. This worried him very much and he was so persistent in his desire to be released from the note, that finally the payee of the note released him in some manner not made clear by the evidence. And there was no evidence whatever showing that there was any real foundation for his apprehension and fear; and besides that, the son had much more property upon the farm of the father than would have been required to reimburse him, even though he had been compelled to have paid the note.

While all of these matters are little things in themselves, yet when occurring persistently under different circumstances, they point to an unsound mind, and especially when viewed in the light of the greater things that transpired before and after their occurrence.

The conduct of Cunningham at the home of Mr. Colsen, upon the occasion of his going to Brookfield, is not in keeping with the actions of a sane man. In the first place, he and Mr. Switzer had agreed to stay over night with Mr. Colsen; and the next morning to walk to St. Catherine and there take the train to Brookfield. The next morning Colsen and Switzer got up and went to the barn to feed the stock. While there, Cunningham got up and in a very excited manner and condition asked Mrs. Colsen what had become of Switzer; he evidently believing Switzer had gone and left him. She tried to pacify him by telling him that Switzer and her husband were down at the barn feeding the stock and would return shortly, and requested him to have a seat and wait until they returned, at which time, she told him they would have breakfast. But not satisfied, he stepped out of the door and none of them saw him again until Switzer met him at the train, some five hours later. In the meantime Cunningham had started

alone to St. Catherine, where he had been hundreds of times, it being only a few miles from there, and became lost, and instead of going toward St. Catherine, he walked almost in the opposite direction and finally turned up at the home of John Pankey, some three and a half miles northwest of said town; and in going from Colsen's house, where he stayed all night, to the home of Mr. Pankey, he had crossed the main public road leading to St. Catherine, which he had traveled for forty years or more in going to and fro, for his mail, and which was in plain view from the point on the road where he had crossed it. While at the home of Mr. Pankey, he said to him and to his son Ray, that he wanted to go to St. Catherine and that he was lost. They showed him a house about a half mile away, southwest, which was on the St. Catherine road, and directed him to go there. After going a short distance in that direction he turned west and went over to the home of Mr. Newman and told him that he was lost and wanted to go to St. Catherine. Mr. Newman showed him the way, and in leaving he said he had stayed all night over in the brush, pointing to the northeast.

Finally, just before eleven o'clock, he reached St. Catherine just in time to catch the train; and when there asked what detained him so long, he replied that he supposed he had a crazy spell.

Suicide is almost invariably the result of melancholy and is indicative of insanity, as testified to by the physician who attended deceased in his last illness.

All of the witnesses who testified to those facts stated that in their opinion Mr. Cunningham's mind was unbalanced; and in fact all of the witnesses who testified on behalf of the respondents say that in their opinion he had been of unsound mind for several years.

Now, in the light of those facts, let us view the action of Cunningham in executing the deed in question.

It must be borne in mind that he was an old man, seventy-two years of age, sick and feeble in body, and as many of the witnesses said, in mind as well, unable to work or earn a living on the farm, and wanted to sell it for twenty dollars per acre, five dollars less than he thought it was worth, in order to get the cash for himself and family, upon which to live.

In that condition what did he do? Without a cent having been paid to him or a scratch of a pen showing Briggs owed him a penny, he conveyed to the latter, a perfect stranger to his blood, eighty odd acres of land, practically all of the property he owned in the world, and thereby pauperized himself and his family, with no hope or belief that he could from that time forward make a living for himself or them; and if he was a sensible man he must have known that he and his wife, if not the son, would, during the remainder of their lives, be compelled to depend upon the cold charity of the world for subsistence; conduct more cruel and heartless than the tortures of the savage. That is not the conduct of ordinary, sensible men, but is in perfect keeping with the acts of a crazy man.

Counsel for appellants practically admit that to be true, but try to break the force thereof by insisting that Cunningham conveyed the land in question to Briggs in trust, for the use and benefit of his wife.

Express Trust.

That insistence has not a scintilla of evidence to support it, but is expressly refuted by the very deed through which he claims the title to this land. Said deed contains no intimation of the fact that he held the land in trust for any purpose, but upon the contrary, the deed conveys to him an absolute title in fee, for the recited consideration of $2400, and acknowledges the receipt of the payment thereof.

This is also admitted by counsel for appellants; or more correctly speaking, they do not deny it, but insist that there was an oral understanding and agreement

between Briggs and Cunningham, to the effect that the former should hold the land in trust for the use of the latter's wife.

That insistence is untenable for two reasons. First, because this record does not contain one word of evidence tending to show any such agreement was ever made between them. Certainly the self-serving deeds and contract made by and between Briggs and Anna Cunningham, mentioned in the evidence, long after the death of Cunningham, are no evidence whatever of the existence of the alleged contract between Briggs and Cunningham, by which it is claimed the former agreed to hold the land for the use of the wife of the latter. And the second reason mentioned is, that a trust of the character mentioned cannot be created by parol agreement; it must be created in lands and tenements by some writing signed by the party declaring the trust.

Section 2868, Revised Statutes 1909, is applicable to such cases, and reads as follows: ''All declarations or creations of trust or confidence of any lands, tenements or hereditaments shall be manifested and proved by some writing signed by the party who is, or shall be, by law, enabled to declare such trusts, or by his last will, in writing, or else they shall be void.''

Counsel for appellants plead an express oral contract between Cunningham and Briggs, creating the pretended trust in favor of the former's wife, and offered to prove that contract by their own testimony, which the court properly excluded.

That ruling of the court was proper for two reasons: First, because Cunningham was dead, and under the statute the other parties to the contract were incompetent to testify; and, second, because such an agreement falls squarely within the letter and spirit of the Statute of Frauds and cannot be proven except by some writing signed by the party creating it. This has been so held by this court in numerous cases, and among others are the following: Hillman v. Allen, 145

Mo. 638; Rogers v. Ramey, 137 Mo. 598; Price v. Kane, 112 Mo. 412; Crawley v. Crafton, 193 Mo. 421; 1 Perry on Trusts and Trustees (6 Ed.), sec. 79.

I am perfectly familiar with the Rogers-Ramey case, having tried it in the court below; and it is on all-fours with this case, and is controlling herein.

But independent of this, suppose it should be conceded that Cunningham did convey the land to Briggs for the use of the former's wife, and that it could be legally established, then what would be the situation?

We would then have a case which in my opinion would point to an unsound mind, as strongly, if not stronger, than do the facts just considered, for the reason that Cunningham had previously made a liberal marriage. settlement upon his wife—considering his financial condition—which in her humble position in life, would have been ample to support her. With that knowledge, which he had, if he was a man of sound mind, he would not in all probability have conveyed to her all the remainder of his property, which was not necessary for her comfort and support, and thereby have turned himself out upon the world, old, sick and feeble, without shelter, food or raiment, or a place upon which to lay his head.

Such conduct is not ordinarily, if ever, observed in men of sense and sound mind, but is in keeping with the morbid and insane delusions of a crazy man.

If the doctrine of *res ipsa loquitur* ever applies to this class of cases, then the facts themselves proclaim fraud and undue influence or insanity.

All of these matters and things were before the chancellor, and he had the witnesses before him and observed their conduct and demeanor upon the witness stand, and was in a far better position to pass upon their credibility and the weight of their evidence than we are in cases of this character.

While this court reserves the right to review and weigh the evidence in equity cases, yet if there is no

special reason existing to the contrary, we will defer largely to the finding of the chancellor who tried the case below and not disturb his conclusions.

In this case, and as just stated, the chancellor saw the witnesses, observed their conduct and demeanor upon the witness stand, and after hearing all the evidence found the issues for the respondents, and rendered a decree accordingly, setting aside and cancelling said deed from Isaac S. Cunningham to Theodore Briggs, dated October 18, 1907, conveying the eighty odd acres of land described in the pleadings and evidence to him in fee. Finding no error in the record, we are of the opinion that the decree of the circuit court should be affirmed and it is so ordered.

All concur.