EARL FIELDS, MURIEL HAZEL FIELDS and PEARL FIELDS KARSTEN, by SAMUEL L. REYNOLDS, Their Attórney in Fact, and SAMUEL L. REYNOLDS v. E. CHESTER LUCK, Executor, and E. CHESTER LUCK and JULIA O. PEARSON, Appellants.—74 S. W. (2d) 35.

Division One, July 17, 1934.

*Frank Yeoman* and *Louis A. Laughlin* for appellants.

*Floyd S. Strattan* and *Luther N. Musser* for respondents.

FERGUSON, C.—This is a statutory will contest and is here on a second appeal. At the first trial the verdict and judgment was against the instrument and our opinion reversing that judgment and remanding the cause will be found at (Mo.), 44 S. W. (2d) 18. On a second trial the jury found against the will but, upon defendants' motion, the trial court set the verdict aside, as being against the weight of the evidence, and granted a new trial. At the third trial plaintiffs or contestants again prevailed and from the judgment entered in conformity with the verdict finding the instrument propounded was not the will of Margaret Luck Roff, deceased, defendants (proponents) have appealed. The property of which the testatrix died possessed was composed entirely of personalty of an appraised value of $9500, hence our jurisdiction.

The testatrix, Margaret Luck Roff, was a resident of Kansas City. She died at Research Hospital, in that city, March 11, 1926. The day preceding her death she executed the will in contest whereby she bequeathed all her property to the defendants, E. Chester Luck and Julia O. Pearson, who are brother and sister and children of Mrs. Roff's former husband, Robert L. Luck, "to be divided between them share and share alike." Mrs. Roff never had any children and the plaintiffs in this action are all of her collateral heirs. Plaintiff Samuel L. Reynolds, is her half brother and the other plaintiffs are the children of John Fields, deceased, who was her brother. The contested will was admitted to probate by the Probate Court of Jackson County on March 20, 1926; the plaintiffs filed this action February 24, 1927. The grounds of contest specified in the petition are undue influence and testamentary incapacity. The trial court

refused to submit undue influence as an issue and submitted the case to the jury on the issue of testamentary capacity alone. As noted the verdict and judgment was against the will. The record is voluminous and the real, substantial and what should be the controlling facts are submerged and well nigh lost in a mass of incidental matter, purported conversations many times repeated and slight circumstances of little, if any, probative value. We shall, however, attempt to piece together a brief statement of the history of testatrix from the time she first became a member of the Luck family and also endeavor to segregate the real and more pertinent facts appearing in the record bearing upon the issue of testamentary capacity.

Margaret Luck Roff was sixty years of age at the time of her death. She was somewhat frail in appearance but very active and energetic. In 1894 Margaret Rogers (the testatrix) was a widow. She owned no property except personal effects of small value. She had no income other than the wages she was earning as a waitress in a boarding house in Kansas City. At that time Robert L. Luck was a widower. He had two children, the defendants herein; the son Chester being then eighteen years of age and the daughter Julia fourteen years of age. Luck advertised for a housekeeper. Margaret Rogers applied for the position and was employed. When she had worked several months as housekeeper in the Luck home in Kansas City she and Luck were married. After the father's marriage to Mrs. Rogers, Julia remained at home for three years and until her marriage when she went to her own home and Chester continued to live at his father's home for eight years and until he married and established his own home. The evidence is uncontradicted that during this period and in fact until after the death of the father and husband an affectionate and parental relationship at all times existed between the stepmother and the children. They addressed her, and spoke of her, as their mother and she referred to them as her children. Mr. and Mrs. Luck continued to live in Kansas City for some time and then moved to a farm in the State of Kansas which Luck purchased and where he died in 1913. By his will Luck devised his real estate to his children on condition they pay their stepmother $3600, and bequeathed all his personal property to his wife. She was also the beneficiary in an insurance policy for $1000. The terms of the will were complied with; the defendants paying their stepmother the amount specified, $3600, whereupon she executed a quitclaim deed conveying to them all her interest in the real estate. The personal property was sold for $1000 so that the total amount received by the widow, including the insurance, was $5600. After the death of Luck the widow returned to Kansas City and resided for several months at the home of defendant E. Chester Luck. Later she lived alone and leased a number of rooms or apartments which

she rented to roomers. In 1915 she married W. A. Roff and they lived together in a rented apartment in Kansas City until his death in September, 1925. Other than that Mr. Roff left $3000 in insurance to his widow it does not appear what, if any, property came to her at his death. There are numerous side lights in the evidence tending to show that testatrix was an energetic, thrifty woman; that she was a good manager, a capable business woman and competently and successfully handled her own business affairs. No claim or suggestion of any mental unsoundness or debility prior to the last illness is made. During the night of Friday, March 5, Mrs. Roff became ill. She requested that her stepdaughter, the defendant Mrs. Pearson, be called and at about four o'clock Saturday morning, March 6, Mrs. Pearson was notified by telephone that Mrs. Roff was ill and she went to Mrs. Roff's apartment. Mrs. Pearson wanted to call a doctor but Mrs. Roff would not consent. Mrs. Pearson administered to and cared for her stepmother during the morning and about noon Mrs. Roff yielded to Mrs. Pearson's importunities and consented that she might call a doctor whereupon a Dr. Hunt was called. The doctor diagnosed Mrs. Roff's illness as pneumonia, prescribed for her and stated he would return later in the day. About four o'clock that afternoon Dr. Hunt returned and upon further examination advised that Mrs. Roff be immediately taken to a hospital. Mrs. Pearson called an ambulance and Mrs. Roff, accompanied by Mrs. Pearson, was taken to Research Hospital and Mrs. Pearson stayed at the hospital with her until nine o'clock that night. (Mrs. Roff died at two-forty o'clock A. M. the following Thursday.) The testimony on the part of the appellants is that on the next day, Sunday, March 7, Mrs. Pearson and her husband, her son and his wife and Mr. and Mrs. E. Chester Luck visited during the afternoon with Mrs. Roff at the hospital. That afternoon Mrs. Roff requested that Mrs. Pearson notify certain friends residing in Kansas City, whom she named, recalling and noting the telephone numbers in some instances, of her illness. Mrs. Pearson at that time asked if she should call the plaintiff, Samuel L. Reynolds, Mrs. Roff's half brother who lived in Leavenworth, Kansas, by telephone but Mrs. Roff said it was not necessary to do that and suggested that Mrs. Pearson write to Mr. Reynolds. Later in the day Mrs. Pearson called the friends named by Mrs. Roff who resided in Kansas City and wrote a letter to Mr. Reynolds which was mailed the next morning, Monday. Chester Luck was the president and manager of the Adams Seed Company, and each morning before going to his office he would visit Mrs. Roff. Mrs. Pearson spent much time daily with Mrs. Roff. Mrs. Roff was a member of several fraternal societies or organizations. On Monday, Mrs. Cox and Mrs. Phenie, members of one of these societies and friends of Mrs. Roff, spent several hours with her and on Tuesday a Mrs. Duncan, a friend and lodge

sister visited her. These witnesses testified that at all the times they were in the hospital room with Mrs. Roff she conversed in a normal, rational and intelligent manner, discussing various matters and though she appeared to be very sick, and at times to be suffering pain, nevertheless appeared to be mentally alert and no mental impairment was noticeable. In this connection they related the conversations and described her appearance and manner. We come now to appellants' evidence concerning the execution of the will. Chester Luck testified that while visiting Mrs. Roff at the hospital on Monday morning, between eight and nine o'clock as he was on his way to his office, she told him she wanted to make a will, that she had intended to do so but had been "negligent about it" and asked him to attend to the matter for her; that when he arrived at his office he called by telephone a Mr. Strattan, an attorney, who had attended to some business for Mrs. Roff and was a member of one of the lodges of which she was a member; that he told Mr. Strattan Mrs. Roff was ill at the hospital and wanted to make a will and requested that he go to the hospital and attend to the matter for her; that when he visited Mrs. Roff about the same hour on Tuesday morning she inquired, in the course of the conversation, "Are you going to have that will made;" that he told her he had called Mr. Strattan the previous day and requested him to come to the hospital and attend to the matter and she said, "He hasn't been out here;" that when he got to his office that morning he again called Mr. Strattan by telephone and Strattan said he had not "been out to see her yet" and, "I will go out today." We will here digress to mention that Strattan testified that pursuant to Luck's request by telephone he went to the hospital and asked to see Mrs. Roff and that the nurse at the desk told him: "The doctor has just been there and given her some medicine and for an hour or two after he does that she is highly nervous and it is not best to see her;" that he gave the nurse his business card and told her that if Mrs. Roff wanted to see him or became worse to let him know and that the nurse made no reply. Note that Mrs. Roff was not at that time attended by an individual or special nurse but by the regular floor nurses. The nurse with whom Mr. Strattan states he conversed and with whom he left his card is not identified other than as being at the desk on the floor on which Mrs. Roff's room was located. Luck testified that on Wednesday morning he called, as usual, at the hospital shortly after eight o'clock and that Mrs. Roff again mentioned the will, said Mr. Strattan had not been there and requested that Mr. Luck have a will prepared; that she told him she wanted to leave her property to him and his sister in equal parts inasmuch as most of it had come to her from their father and that she had already provided for her half brother (plaintiff Reynolds) and that she had not seen or heard from the Fields children for many years and stated, in effect,

772

that she felt no obligation toward them. In this connection we again digress to observe here that the evidence shows Mrs. Roff invested the $3000 in insurance money received at the death of Mr. Roff in two building and loan certificates, each for $1500, and caused the certificates to be made payable to "Margaret Luck Roff or Samuel Reynolds or survivor." She also carried a life insurance policy for $1000 in which Samuel Reynolds was named sole beneficiary and a policy of life insurance for $300 in which Pearl Reynolds, daughter of Samuel Reynolds, was sole beneficiary. Pursuant to the further request of his stepmother on Wednesday morning Luck set about to have a will prepared. He called his office by telephone (shortly after eight o'clock) and instructed his secretary, Miss Florence Dean, to call Mr. Strattan by telephone and tell him to come to the hospital and write the will and that if she was unable to get in touch with Mr. Strattan to call Mr. Frank Yeoman, another attorney, and, if she could not get either of them, to use a form book which he had in the office and write a will for Mrs. Roff making his sister and himself the beneficiaries. Miss Dean testified to this telephone conversation and stated that she endeavored to get both Mr. Strattan and Mr. Yeoman by telephone but was unable to locate them, and thereupon she wrote the will as instructed by Mr. Luck, using the form book, and then called Mr. Luck, by telephone, at the hospital and told him that she had prepared the will. At that time he told her to bring the will to the hospital and bring some one to act with her as a witness. Mr. James F. Norvell, a relative of Miss Dean, whose home was near Lee's Summit, Missouri, was in the office at the time, and Miss Dean asked him to accompany her, and they went to the hospital, arriving there about nine o'clock. When they entered the room at the hospital occupied by Mrs. Roff they found Mr. Luck there and a hospital maid, Katherine Fergus, engaged in cleaning the room. Those present with Mrs. Roff at the time were Luck, Mr. Norvell, Miss Dean, and the maid, all of whom testified to what then occurred substantially as follows. Mr. Luck took the written form of will from Miss Dean and handed it to Mrs. Roff and said: "Mother, here is the will. Do you want to sign it?" Mrs. Roff replied: "Give me my glasses from the dresser drawer," which the maid did. Mrs. Roff raised herself slightly in bed, put on her glasses, and read the will. When she had finished reading it she said: "That is alright. Let me sign it." There was a tray with breakfast dishes on a nearby table. The dishes were removed from the tray and it was placed on Mrs. Roff's lap. Mr. Luck handed her a fountain pen and she signed the will. Miss Dean and Mr. Norvell then signed it as witnesses at her request.

The will was executed about, or shortly before, nine o'clock. Following the signing of the will, Mrs. Roff gave Mr. Luck a list of the various stocks she owned. Miss Dean and Mr. Norvell left the hos-

pital, but Mr. Luck remained, sought out Dr. Hunt, and requested him to get a special nurse for Mrs. Roff. Mrs. Pearson arrived at the hospital about ten-thirty that morning, and the special nurse came about eleven o'clock. At about midnight, alarming symptoms became manifest, and Mrs. Pearson was called by telephone to the hospital and remained with Mrs. Roff until her death at two-forty o'clock A. M., Thursday, March 11.

The subscribing witness Miss Dean having related the facts and circumstances surrounding the signing and execution of the instrument was asked: "From what you saw and heard at the time the will was executed state whether or not in your opinion Mrs. Roff was of sound mind at the time she signed it." Plaintiffs' objection being overruled the witness answered: "In my opinion she was of sound mind." The other subscribing witness, Norvell having related substantially the same facts and circumstances surrounding the making of the questioned instrument was not, upon plaintiffs' objection, permitted to give an opinion as to the mental state of testatrix based upon what he observed and heard at the time. Appellant assigns this ruling of the court as error; we will hereafter, in proper course, discuss the assignment.

On the part of the contestants six lodge sisters of Mrs. Roff who had known, and associated with her in lodge activities testified to various conversations with her in which she expressed resentment toward the "Luck children" (the defendants) and made declarations of her intention relative to the disposition of property owned by her at the time of her death. Some of these declarations were said to have been made fifteen years before her death, others at various times thereafter and as late as Thursday before she became ill on Friday night. There was much similarity in these conversations and declarations as related by the witnesses. From the testimony of these witnesses we glean these declarations which Mrs. Roff is reported to have made at various times; that the "Luck children hadn't treated her right;" that "the Luck children beat her out of everything Luck had and that a $1000 was all she got out of his estate;" that she "didn't want the Luck children to have any of her property when she died because of the way they treated her;" that she "had one brother" (plaintiff Reynolds) and "intended to leave all her property to him;" that she "wanted everything she had to go to her brother;" and that she wanted certain pieces of her jewelry to go to her niece Pearl Reynolds (daughter of plaintiff Samuel Reynolds). These statements were repeated, reiterated and elaborated upon with, at times, the opinions and declarations of the witness herself freely interspersed. Two or three of the lodge sisters testified that they had not been at once and promptly notified of Mrs. Roff's illness (the imputation evidently being that Mrs. Pearson was in some way delinquent and designing in not notifying

them) and when they did learn of it and called at the hospital some nurse there had told them Mrs. Roff was a "very sick woman," that "visitors were not allowed" and they were not permitted to see Mrs. Roff. They do not claim that Mrs. Pearson or Luck denied them admission but that some one connected with the hospital did. One of these witnesses testified that Mrs. Roff told her the day she became ill that "she was going to make a will that week." Here we turn from the evidence offered by contestants to observe that defendants on their part had testimony of a number of witnesses, some of them also lodge sisters, friends, associates and neighbors of Mrs. Roff tending to show that a cordial, close and friendly relationship at all times existed between Mrs. Roff and the defendants; that they visited each other; that when Mrs. Roff would be ill she would call for Mrs. Pearson who would nurse and care for her; that Mrs. Roff always spoke affectionately of the defendants as her children and introduced them, even while ill in the hospital, as her children; that they always spoke of her as mother and their children spoke of her as "Grandma Luck." Returning to contestants' evidence, the letter written by Mrs. Pearson to plaintiff Samuel Reynolds dated Sunday, March 7, together with envelope and postmark thereon were offered in evidence. There being nothing misleading about the letter it evidently was thought to impute some intentional and designing delay to Mrs. Pearson. The postmark shows the letter received at the post office in Kansas City, March 8 (Monday) 12:30 P. M. Mrs. Ida Reynolds, wife of Samuel, says they received the letter on Tuesday; that she then called Mrs. Pearson by long distance telephone. It is not claimed that Mrs. Pearson did not at that time fully and correctly advise Mrs. Reynolds of Mrs. Roff's condition; however, none of the Reynolds family went to Kansas City until the afternoon of the next day, Wednesday, when Mrs. Reynolds and the daughter Pearl arrived at the hospital and visited with Mrs. Roff for from "five to eight minutes" sometime between three and four o'clock that afternoon. (The will had been executed at about nine o'clock that morning.) They testified that when they went into the room Mrs. Roff was "lying with her eyes closed . . . looked as if she were asleep . . . and breathing heavily;" that when Mrs. Reynolds spoke to her she opened her eyes, recognized them, called them by name, conversed with them briefly but her "voice was very weak" and that "after some conversation she closed her eyes, acted as if she were too tired to talk." Mrs. Reynolds stated: "I couldn't say she was not of sound mind but think she was too sick at that time to know or care for anything." Pearl Reynolds stated an opinion "based upon what" she "observed," as above stated, that Mrs. Roff "was at that time of unsound mind." A Mrs. Smith, a roomer at Mrs. Roff's apartment, became ill with pneumonia the day before Mrs. Roff became ill. Mrs. Smith testi-

fied that Dr. Hunt also attended her and that on Monday about eleven o'clock A. M. she was taken to Research Hospital and placed in the same room with Mrs. Roff and remained there until about the same time the following day, Tuesday, when she was moved to another room and that during the time she was in the room with her Mrs. Roff at times "would cough up a little, a sort of a phlegm like anyone has where one has pneumonia . . . moaned as though in pain" and several times ask "are they going to bob my hair." The witness admitted that she overheard a perfectly rational conversation between Mrs. Roff and Luck in which Mrs. Roff requested him to attend to some business matters for her and directed him where to go and what to do in reference to same. However the witness gave an opinion that during the time she was in the same room with her Mrs. Roff was of unsound mind.

■ Here and in connection with proponents' (appellants) demurrer to the evidence we note that, except the testimony of Dr. Hunt to which we shall presently refer, the foregoing is, we think, a fair summary of contestants' evidence as to testamentary incapacity and if it stood alone and were the sum of the evidence on the part of contestants bearing on that issue we would be inclined to hold that it does not constitute substantial evidence of mental incapacity to execute the will in question. Proponents made prima facie proof of testamentary capacity and thereupon "the weight of the evidence was against contestant," and it became necessary "in order to obtain a submission of the issue of testamentary incapacity" for contestants to adduce some substantial evidence "tending to support that affirmation." [Sanford v. Holland, 276 Mo. 457, 207 S. W. 818; Williams v. Lack, 328 Mo. 32, 40 S. W. (2d) 670.]

■ This brings us to the testimony of the attending physician Dr. Hunt who appeared as a witness for contestants. The doctor testified, that Mrs. Roff's illness was "pleural pneumonia;" that when she was taken to the hospital "her pulse was weak" and she had "no resistance;" that there was a "progressive decline from the (first) time he saw her until she died;" that during the entire time "she was moribund (in a dying state) . . . in a low state of physical condition, in extreme pain, in her side, when she took a breath . . . was apathetic and disinterested;" that her condition was marked by "apathy, indifference and inattentiveness;" that she was "somewhat delirious at times" but, when asked, at another time, about delirium, that "she wasn't in delirium in the sense that she was flighty;" that he called on her two or three times daily and "recalls her condition very well" though has "no distinct recollection of her condition at any particular hour." The "Progress Record" which is kept by the attending physician was introduced in evidence. Dr. Hunt testified that all the entries on this record were in his handwriting and made by him. This record

presumably is made by the attending physician during the course of the illness. The record reads:

"3/6. Pt. entered. pneumonia.

"Pain. s. breath. cough. slight delirium.

"Weakness. Prognosis bad from start.

poor phys. cond. Pt. quite exhausted.

"Progressive decline to date death, mental confusion.

"Pulse became weak. Pt. had no resistance.

"3/11/26."

Appellant's had evidence tending to show that the words "slight delirium" and "mental confusion" were added to this record some months after Mrs. Roff's death. This was a question of fact however for the jury to resolve upon the testimony of the witnesses who so testified and the testimony of the doctor concerning the record. It will again be recalled that the will was executed at about nine o'clock Wednesday morning. Dr. Hunt visited the patient at nine-thirty that morning. He testified that at that time "she was worse than she was the day before" and "symptoms of apathy and debility" were manifest. These questions were propounded to Dr. Hunt and answered as follows:

"Q. From your judgment and knowledge of the disease with which Mrs. Roff was suffering and her physical condition, lack of resistance, have you an opinion as to what her mental condition was, as to soundness, on Wednesday morning, the 10th day of March at 9 o'clock that morning? A. I have.

"Q. Just tell the jury what your opinion is. (Defendant's objection overruled.) A. She was unsound.

"Q. Unsound mind? A. Yes, sir."

The doctor then said: "My opinion is based upon the observation of the patient through her entire sickness concerning her mental deterioration and debility as well as physical." At another point in his testimony the doctor stated that he had a "vivid recollection of this patient and is positive as to her mental and physical condition . . . she was frail and weak; the pneumonia caused so much pain in the side that most of the time she was in misery . . . she was disinterested in anything that went on about her." This testimony of the attending physician concerning the physical condition and accompanying or resulting mental debility and deterioration which he says existed during the entire illness together with the opinion he gave based upon his personal observation of the patient must be accepted and treated as substantial evidence tending to support the affirmation of testamentary incapacity and the trial court therefore properly refused proponents' demurrer to the evidence.

■ The subscribing witness James F. Norvell resided at Lee's Summit, Missouri. He was related by marriage to Miss Dean and her family. He had come to Kansas City on Tuesday, spent Tues-

day night at the home of Miss Dean's family and on Wednesday morning accompanied Miss Dean to the office of the Adams Seed Company where she was employed as Mr. Luck's secretary. Mr. Norvell was in the office at the time Mr. Luck called Miss Dean by telephone. Mr. Norvell was not acquainted with Mrs. Roff. Pursuant to instructions that she come to the hospital and bring some one to act with her as a witness Miss Dean requested Mr. Norvell to accompany her as an attesting witness. When Miss Dean and Mr. Norvell arrived at the hospital they were met by Luck who escorted them to Mrs. Roff's room. Luck introduced Norvell to Mrs. Roff and told her that "Miss Dean and Mr. Norvell have come to sign the will as witnesses." Mrs. Roff acknowledged the introduction. Norvell was called as a witness by proponents. On direct examination he testified to the events, circumstances and conversation which occurred after his arrival at Mrs. Roff's room and in connection with the execution of the instrument, a brief statement of which we have made supra. Having so testified the record shows the further course of his direct examination as follows:

"Q. State whether or not you saw anything in her actions or what she said that would indicate she wasn't in possession of her faculties?

Mr. Musser (attorney for contestants): We object to that for the reason that there has been no foundation laid; he never knew the lady before and never saw her afterwards and never heard her talk except just as he has related it, and we object to that as being incompetent and that it invades the province of the jury and he should not be permitted to answer the question.

"The Court: Objection sustained.

"Mr. Laughlin (attorney for proponents): To which we except.

"Q. From what you saw and heard at the time the will was executed, state whether or not in your opinion Mrs. Roff was of sound mind at the time she signed it.

"Mr. Musser: The plaintiffs object to the question on the same grounds heretofore stated, that it calls for a conclusion and he hasn't laid any foundation for this witness, and it invades the province of the jury, and it is incompetent.

"The Court: Objection sustained.

"Mr. Laughlin: To which we except.

"Q. Mr. Norvell, at the time you were there in that room in the presence of Mrs. Roff, did you see anything unusual either in her actions or in what she said—

"Mr. Musser (interrupting): Object to the question, trying to get by indirection what they can't do by direction. 'Anything unusual.'

"THE COURT: Objection overruled.

"MR. MUSSER: To which we except.

"A. I did not."

Appellants assign and urge as reversible error the action of the trial court in sustaining contestants' objections to the above questions and refusing to permit this attesting witness to give an opinion, based upon what he at the time observed and heard, as to the mental soundness of testatrix at the time she executed the will. Our statute (Sec. 518, R. S. 1929) provides that "any . . .. woman of twenty-one years of age and upward, of sound mind" may make a will and that such will "shall be in writing, signed by the 'testatrix' and shall be attested by two or more competent witnesses subscribing their names to the will," etc. Norvell was concededly a competent subscribing witness. We answered the query: "What do the subscribing witnesses affirm," in German Evangelical Bethel Church v. Reith, 327 Mo. 1098, 39 S. W. (2d) 1057, by quoting, with approval, as follows from Nunn v. Ehlert, 218 Mass. 471, 106 N. E. 163: "When the statute requires that the witnesses shall attest, what is it that they are to bear witness to? Plainly to those facts to which they have to testify when put on the stand as attesting witnesses, namely, that those things existed and were done which the statute requires must exist and be done to make the writing a valid will." By his attestation Norvell affirmed that, as the statute requires, Mrs. Roff was of sound mind. He had testified to conduct and conversations consistent with soundness of mind. While no formal offer was made that if the witness were permitted to answer the question, to which the objections were sustained, he would state that in his opinion based upon the conduct, demeanor and conversation of testatrix, and the circumstances and events surrounding the execution of the will, she was of sound mind at that time, it is so apparent upon this situation that he, being one of the subscribing witnesses, would have so testified had he been permitted to do so; it at least clearly appears from the fact that he was a subscribing witness and from his previous testimony that such would probably have been his testimony. [Wahl v. Cunningham, 320 Mo. 57, 6 S. W. (2d) 576.] It is said at 3 Corpus Juris, page 827: "The fact that a party failed to formally state what answer a witness was expected to make to an excluded question does not preclude him from obtaining a review of the ruling excluding the question, where it was obvious what the answer was expected to be." The gist of the objections which were sustained was that the witness was not qualified to give an opinion as to the soundness of mind of the testatrix at the time she signed and executed the will because he had not, prior to that time, known Mrs. Roff and never saw her afterwards and "never heard her talk except" at the time of the execution of the will and inferentially no basis for a comparison existed. The

court in effect ruled, and the jury must be assumed to have so understood, that this witness was not qualified or competent to give an opinion based merely upon what he observed and heard at the time. At 7 Mo. 589, it was said that the "business" of the attesting witnesses required by the statute "is not barely to attest the corporeal act of signing but to try, judge and determine whether the testator is *compos* to sign." This excerpt from Helm v. Sheeks, 116 Miss. 726, 77 So. 820, appears in point: "The statute requires two witnesses to witness the execution of a valid will, and the purpose of the statute in requiring witnesses is not only to establish the writing or signing of the instrument, but to have witnesses whose business it is to determine the capacity of the testator making a will." The following concerning the opinion of a subscribing witness is found at pages 513, 515 and 516 of Alexander on Wills:

"On the issue of testamentary capacity the testimony of subscribing witnesses is of great importance. Having been present at the time of the execution of the will, having to a greater or less extent had their attention directed to the nature of the act the testator was performing, having been called on to subscribe their names to a particular document as witnesses, and having had the opportunity of observing the actions of the testator and all surrounding circumstances at the particular moment as to which the mental capacity is to be determined, subscribing witnesses, although not experts, are allowed to give their opinions as to the sanity or insanity of the testator at that time, and as a general rule a nonexpert subscribing witness may state his belief, without giving the facts upon which it is founded. The opinion of a subscribing witness, however, must be based on what he saw and heard at the time the will was made. He cannot give his belief in answer to hypothetical questions; in that respect he is the same as any nonexpert witness. . . . The law presumes that a subscribing witness had his attention directed to and noted the mental capacity of the testator, therefore his opinion should be entitled to more weight than that of one who was merely passive. Having the duty of observation, it will be presumed that a subscribing witness was more observant than others might have been. . . . Neither the opinion or the testimony of a subscribing witness is conclusive and he may be contradicted by other evidence."

Page on Wills, section 696, says:

"It is settled by the almost unanimous weight of authority that the subscribing witnesses to a will may give their opinion as to the sanity or insanity of the testator without any reference to their means of determining his mental capacity, or their ability to judge of his capacity with the means at their disposal. They need not make a special examination of the testator; or even be acquainted with him, if the circumstances attending the execution of the will call

their attention to his mental condition. The subscribing witnesses may give their opinions as to the sanity of testator without first stating the facts upon which they base their opinions, although they may also give their opinions in connection with the facts of execution.''

And the rule is stated in Corpus Juris (22 C. J., p. 609) as follows:

''The English rule permitting the attesting witnesses to a will or deed to testify as to the sanity of a testator or grantor at the time of executing the instrument is very generally accepted in the United States, even in jurisdictions where the inferences of other unskilled observers would be rejected. A statement of the facts on which the inference is based is usually considered unnecessary in the case of an attesting witness to a will, nor is any qualification as to opportunity for observation beyond that afforded when he attested the will required of the witness.''

We think it clear that it was competent for Norvell as a subscribing witness, and that he was qualified to do so, to state the opinion excluded by the trial court and that proponents were entitled to the benefit of such testimony. That seems, at least tacitly, to now be conceded by contestants, as the writer understands respondents' argument here, but respondents contend that the exclusion of this testimony could not have been prejudicial to proponents because after the court in effect ruled that the witness was not competent or qualified to state an opinion and that no foundation had been laid upon which the witness could properly base an opinion the court permitted proponents to ask the witness whether he saw anything unusual about Mrs. Roff's conduct while he was in the room and the witness answered ''I did not.'' On cross-examination contestants pressed the witness as to what he meant by the term ''unusual'' and the several questions along that line finally culminated by the witness saying, ''There was nothing unusual is the only way that I can answer.'' It must be assumed that as a consequence of the court's prior ruling the jury understood this witness was not qualified to express an opinion as to the soundness of mind of testatrix at the time the will was made because he had not known her before that time, had never heard her talk except on that occasion and never again saw her and in view of that situation the general statement that he did not see anything unusual about her conduct could not likely have been of sufficient weight and force to cure the error theretofore committed by the ruling of the court. Such conclusion or opinion cannot be reckoned to have atoned for the loss to proponents of the benefit of the statement of a clear, untrammeled opinion by the attesting witness that the testatrix was of sound mind. In view of the fact that mental soundness was the ultimate, controlling and decisive factor involved and that contestants offered several nonexpert witnesses who were permitted to give an opinion,

based upon what they observed and heard at various times before and after the will was made, that testatrix was at such times of unsound mind it would seem to necessarily follow that the ruling that the attesting witness was not qualified to give an opinion as to mental soundness of the testatrix at the time she made the will and the refusal to permit him to give such opinion was prejudicial to proponents.

The giving of the following instruction, at the request of contestants, is assigned as error:

"The jury is instructed that under the statute of wills in this state, the sanity of a testator is not presumed, but the burden of proof is upon those asserting the will, to affirmatively show that the deceased was of sound mind when she executed the will, and unless the defendants have so proven to your satisfaction your verdict should be for the plaintiffs and against the will."

The rule is well settled in this State that the burden of proof is upon him who propounds the will to show that the testator was of sound mind at the time he made the will and in an action contesting the will on the ground of mental incapacity such burden remains with proponent throughout the case. [Rock v. Keller, 312 Mo. 458, 278 S. W. 759; Goodfellow v. Shannon, 197 Mo. 271, 94 S. W. 979; Major v. Kidd, 261 Mo. 607, 170 S. W. 879; Mayes v. Mayes (Mo.), 235 S. W. 1. c. 105; Berkemeier v. Reller, 317 Mo. 614, 296 S. W. 739; Schoenhoff v. Haering, 327 Mo. 837, 38 S. W. (2d) 1011; Erickson v. Lundgren (Mo.), 37 S. W. (2d) 629.] But appellants argue that though the burden of proof was upon them to show mental capacity it was error to tell the jury "the sanity of a testator is not presumed;" that they were entitled to the benefit of the presumption that all men are sane and the instruction is erroneous and prejudicial in depriving them of the benefit of that presumption. It is urged by respondents that the effect of our statute of wills is to abolish and eliminate the presumption of sanity. We have repeatedly in will cases referred to this presumption and seemingly recognized that under some situations it obtains. This court said in Jackson v. Hardin, 83 Mo. 175, "The law presumes that the testator was possessed of a sound and disposing mind." It is stated in Lindsey v. Stephens, 229 Mo. 600, 129 S. W. 641: "The law presumes that a testator is of a sound and disposing mind until there is evidence tending to overcome this presumption." In Norton v. Paxton, 110 Mo. 456, 19 S. W. 807, this court said: "It is sufficient for those who claim under the will to make out a prima facie case in the first instance. There is a presumption that every adult person is *compos mentis*, but the presumption is one of fact only. It may be that the production of a will, reasonable on its face, with proof of due execution and attestation, and that the testator was of full age, will make out a prima facie case on the part of the proponents,

thus giving full force to the presumption, though the usual course is to offer some evidence of mental capacity. The parties claiming under the will having made out a prima facie case, the contestants must bring forward their evidence. But it does not follow from all this that the burden of proof shifts. It remains with those claiming under the will.'' The foregoing is quoted with seeming approval in Goodfellow v. Shannon, supra, and again by this court, en banc, in Major v. Kidd, supra. We take the following from pages 541-543 of Alexander on Wills: ''The weight of authority, however, and the better reasoning are that the proponent of a will must, in the first instance, establish his prima facie case by proof of the testamentary capacity of the testator. Although, in the absence of evidence to the contrary, all persons are presumed to be of sound mind, and although this presumption may be accepted as a wise and profound rule of testamentary common law, yet it is not sufficeint in itself to absolve the proponent from the necessity of proving the testamentary capacity of the testator. It must be remembered that the right to dispose of an estate by will is statutory, and when one relies upon a will in order to gain property in opposition to the heir, it is but just that he should establish the fact that the decedent had testamentary capacity. However wise may be the presumption of soundness of mind, yet the conscience of the court must be satisfied of the mental capacity of the testator, and this the presumption alone is not able to do. It is not strictly a legal presumption; it is more a presumption of fact, an inference to be drawn in the absence of evidence. The law requires that no will be admitted to probate except that of a testator of sound mind, and unless the court is fully satisfied on this point, the instrument should be rejected. It has been claimed that there is an inconsistency in requiring proof of what the law presumes, but it appears better to say that the inference of fact that may be drawn without proof is not sufficient to satisfy the absolute requirement of the statute that no instrument can be the last will of a decedent unless executed when he was of sound mind.'' Page on Wills, at section 689, says: ''It has been said that the presumption is one upon which proponent may rely if there is no evidence to the contrary and that it has no probative force if evidence to the contrary is introduced.'' In the instant case the proponents having made, in the first instance, a prima facie case of sanity the contestants came forward with evidence tending to show testamentary incapacity and thereupon proponents introduced further evidence tending to sustain testatrix's sanity. If the instruction means there is no conclusive presumption of sanity, as a matter of law, it is correct in that respect. If it means that under the statute of wills the presumption is not available or of any aid to proponents though there be no evidence to the contrary we are inclined to think it is not a correct statement as an abstract proposition of law but

under the circumstances of this case contestants having offered evidence tending to show that testatrix was of unsound mind at the time she made the will and proponents' evidence tending to show mental soundness it was for the jury to draw such inferences of fact therefrom as they deemed proper and the presumption had no probative force and should not enter as a factor into the determination of the question of testamentary capacity. Since, in view of the conflicting evidence, in this case, the effect of the instruction with the jury could have been no more than to advise them that such a presumption was not to be considered by them we are of the opinion that it was not prejudicial though the form of the statement or the propriety or necessity for any reference in the instruction to the presumption might well be doubted.

Mrs. Smith, Mrs. Ida Reynolds and Pearl Reynolds, as witnesses for contestants, after having detailed the facts upon which they based their opinions were permitted, respectively, over proponents' objections, to give an opinion that testatrix was of unsound mind on Monday afternoon and Tuesday morning before, and Wednesday afternoon following, the making of the will on Wednesday morning. One ground of proponents' objections was that the witnesses had not detailed any facts as a basis for such opinion which were inconsistent with soundness of mind. Appellants complain of the action of the trial court in overruling their objections and permitting these witnesses to give opinions that testatrix was at such times of unsound mind. We have set out above, in a condensed form, but nevertheless the substance of, the facts detailed by these witnesses upon which they purported to base their opinions. By reference thereto it will be found that neither Mrs. Reynolds nor her daughter Pearl recited any facts, actions, language or conversation on the part of Mrs. Roff during the "five to eight minutes" they were in the hospital room on Wednesday afternoon which tended to show that Mrs. Roff was irrational, delirious or mentally deranged. Their testimony showed no more than that Mrs. Roff was very sick and physically weak as was unquestionably, her condition; both testified, in effect, that her conversation with them while brief was rational. Nor were the facts related by Mrs. Smith as a basis for her conclusion or inference that Mrs. Roff was of unsound mind during the time she was in the same hospital room with her inconsistent with sanity or a sound mind on the part of Mrs. Roff. It is true that Mrs. Smith testified that Mrs. Roff several times repeated the question, "Are they going to bob my hair," and implied that in so doing Mrs. Roff was not aware of what she was saying but that is the only circumstance related by Mrs. Smith which could, even by implication, be considered as indicative of delirium or mental confusion and it is of such doubtful significance as to hardly afford a reasonable basis for an opinion that she was of unsound mind during the entire time Mrs. Smith

784

says she was in the hospital room with Mrs. Roff. We are inclined to think that, under the rule in this State, these witnesses were not competent to give opinions, draw inferences or state a conclusion, for the jury, based upon the facts which they detailed, to the effect that Mrs. Roff was, at the times to which they referred, of unsound mind. In Parks v. Marshall, 322 Mo. 218, 14 S. W. (2d) 590, this court said: "It is a well-settled rule of law in this State that non-expert witnesses shall relate, before being permitted to express an opinion as to the mental condition of one, as a condition precedent thereto, the facts in their knowledge upon which they base their opinion. [Hunter v. Briggs, 254 Mo. 28, 162 S. W. 204; Huffman v. Huffman, 217 Mo. 182, 117 S. W. 1.] If a witness founds his opinion as to the mental condition on competent facts then his opinion is admissible." In Berkemeier v. Reller (Mo.), 37 S. W. (2d) 430, the authorities are compiled and cited and we said: "Reviewing the authorities . . . we find the rule generally to be as follows: Lay witnesses must relate the facts upon which they base their opinion, that the individual whose sanity is in question is insane; the facts related must be inconsistent with the sanity of such individual and, if not inconsistent therewith, the witness should be rejected or not permitted to express his opinion, since the opinion of a lay witness as to the insanity of an individual is of no weight and value when not based on facts inconsistent with sanity." [See, also, Loehr v. Starke, 332 Mo. 131, 56 S. W. (2d) 772, and Kaechelen v. Barringer (Mo.), 19 S. W. (2d) 1033.] Lay witnesses should not be allowed to give their opinions that a testator was of unsound mind when they do not, as a condition precedent, testify to facts, of their own knowledge, which are inconsistent with sanity. Necessarily it is ofttimes difficult for a trial judge to determine whether such witness is competent to express an opinion and since a determination of whether the facts detailed warrant the receipt of such opinion or inference rests in the discretion of the trial court its "action will not ordinarily be reviewed, although it is subject to reversal in extreme cases where an improper exercise of discretion appears." [22 C. J., p. 609.] As this case is to be remanded the admissibility of inferences or opinions of lay witnesses as to the mental condition of testatrix will be governed, on retrial, by the rules laid down in the authorities above cited and referred to.

Appellants refer us to numerous other rulings of the court admitting evidence on the part of contestants of which they complain. Some of these complaints have to do primarily with the order of proof and may be corrected, if important, on a retrial. The evidence introduced by contestants concerning the payment of a building and loan certificate to the executor and the controversy about same neither tends to prove or disprove testamentary capacity nor does it appear to have any bearing on undue influence, set up in the petition, but introduces a controversy foreign to, and apart from, the issues

involved in this action. Isolated instances of the admission of alleged incompetent, immaterial and prejudicial testimony are pointed out. Proper limits of an opinion forbid us going into detail concerning these complaints and we leave the matter of admission or rejection of testimony offered on a retrial to the discretion of the trial court.

For the reasons stated the judgment is reversed and cause remanded. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.