WILLIAM T. NUTE v. J. CLARENCE FRY and ROBERT W. PRINGLE,
Executors of the Estate of GEORGE H. NUTE, J. CLARENCE FRY,
and ESTHER M. FRY, His Wife, ROBERT W. PRINGLE and GEORGIA
PRINGLE, His Wife, LOUISE HAINES, MINA LOERSCH and WALTER
LOERSCH, Her Husband, CLARA A. NUTE, TOWN OF WOLFBORO,
in Carroll County, in the State of New Hampshire, GEORGE H.
NETTLETON HOME FOR AGED WOMEN, a Corporation, and MERCY
HOSPITAL, a Corporation, Appellants.—111 S. W. (2d) 84.

Division Two, December 17, 1937.*

*Louis A. Laughlin* and *James H. Harkless* for appellants.

*NOTE: Opinion filed at May Term, 1937, June 21, 1937; motion for
rehearing filed; motion overruled August 26, 1937; motion to transfer to
Court en Banc filed; motion overruled at September Term, December 17,
1937.

*T. N. Haynes* and *Farrar & Phillips* for respondent.

WESTHUES, C.—This suit was brought to set aside the last will and testament of George H. Nute, deceased. A jury trial resulted in a verdict for contestant. An appeal was taken from the judgment entered setting aside the will.

The case was submitted to the jury upon both charges of the petition, which alleged mental incapacity on the part of the testator and undue influence in the execution of the will. Appellants' main contention on this appeal is, that the evidence was insufficient to sustain either charge, and therefore the trial court erred in not directing a verdict upholding the will. A careful consideration of the evidence has convinced us that appellants' contention must be sustained. This necessitates a rather full statement of the facts. The deceased, testator, died on September 28, 1931, at the age of eighty-six years. The will in question was executed on February 4, 1931. A codicil was added thereto on August 2, 1931. The deceased, who was born in New Hampshire, went to Kansas City in the early eighties. He married a Mrs. Brinkley, who had a daughter named Georgia Brinkley. Mrs. Nute died in the year 1923. The testator's stepdaughter married Robert W. Pringle, who was one of the parties charged with exerting undue influence upon the testator. The testator's heirs were: Mina Loersch, Buffalo, New York, wife of Walter Loersch and daughter of Eugene S. Nute, a deceased full brother; Louise Haines, Amesbury, Massachusetts, daughter of Addie Haines, a deceased half-sister; and William T. Nute, Jr., Los Angeles, California, son of William T. Nute, Sr., a deceased half-brother.

William T. Nute, Jr., was the plaintiff, while the other heirs named were defendants. Other defendants were beneficiaries named in the will who were not of kin to the testator. The will was executed at a hotel in Strasburg, Cass County, Missouri. By this will he disposed of an estate of about $30,000. The pecuniary bequests are as follows: Louise Haines, $10,000; Mina Loersch, $3000; Walter Loersch, $1500; Clara A. Nute, widow of Eugene S. Nute, $5000; Town of Wolfboro, New Hampshire, $1250; Esther M. Fry, $500; William T. Nute, Jr., $100; George H. Nettleton Home, $2000. J. Clarence Fry and Robert W. Pringle were made residuary legatees and executors of the will. The codicil makes the following changes in the will of February 14, 1931: The legacy to Mina Loersch is increased from $3000 to $5000; the legacy to William T. Nute is increased from $100 to $250 and the legacy to the George H. Nettleton Home is reduced from $2000 to $1500.

The evidence disclosed that the testator was very fond of the plaintiff, William T. Nute, Jr. There was testimony that the testator often remarked that he would leave at least a considerable portion of his property to his nephew. The testator did not feel so kindly toward the contestant's mother. It was shown that the testator became angry because the plaintiff's mother had sent a telegram to the offices at the stockyards in which she threatened to see a lawyer if she did not receive certain money due her. The testator also became incensed at plaintiff's mother because she had not placed a marker at the grave of her husband, William T. Nute, Sr., the testator's half-brother and former partner. The testator wrote a letter to plaintiff's mother reproving her because she had not attended to this matter. Plaintiff's mother, who was then Mrs. Kelly, testified that at the time this letter was written the marker had been placed at the grave and she had so advised the testator before the reproaching letter was written.

Testator was, for many years, a livestock broker at the Kansas City stockyards. In the year 1900, his half-brother, William T. Nute, Sr., father of the contestant, became a partner in this business under the firm name of Nute Brothers. This partnership was dissolved in the year 1911, by the death of William T. Nute, Sr. The testator was appointed guardian, and acted as such over the estate of William T. Nute, Jr., the contestant, until he reached the age of twenty-one years, which was in the year 1930. After the death of William T. Nute, Sr., testator continued in his business in his own name until the year 1914, when J. Clarence Fry, who had been a bookkeeper in the offices, became a partner. In the year 1921, Robert W. Pringle, who was also an employee, was taken into the partnership. In the year 1928, the testator retired from the business and the partnership continued under the firm name of Fry & Pringle. In March, 1924, testator suffered with a paralytic stroke, which noticeably affected his speech and right arm. Thereafter he spent most of his time on a large farm that he owned near Strasburg, in Cass County, Missouri, where he raised cattle and hogs. The testator, after retiring from business, spent some time in the Pringle home. In the early part of 1929, he went to the Shores Hotel in Strasburg, which continued to be his home until the month of September, 1931, when he became seriously ill and was taken to St. Luke's Hospital in Kansas City, Missouri, where he died on the 28th day of that month.

Ten or more lay witnesses testified on behalf of the contestant. Only two of these ventured the opinion that the testator was of unsound mind. We shall briefly state the facts, as testified to by these witnesses, upon which they based their opinion that testator was of unsound mind. Witness D. F. Tuttle lived on the farm of the testator during the years 1925 to 1927, during which time he was em-

ployed by the testator to do farm work and to be boss of the men working on the farm. This witness testified that at first it was hard for him to understand the testator, but after a time it was less difficult. He also testified that testator, to some extent, had lost control of his bowels and kidneys; that there was a bad odor in his room; that at one time two of the bulls were fighting and testator attempted to separate them; that the testator was hard to get along with and often quarreled with and discharged the farm hands; that he discharged the witness three or four times and then rehired him; that he insisted the hogs be sorted often, at times every day; that the testator was pleasant on some occasions and at other times disagreeable; that he, the witness, wrote out the checks for the payment of the various bills on the farm and the testator would sign them. This witness also stated that on several occasions the testator cried and made the remark, "I'm just a damned old fool." He testified that Mr. Pringle told Mrs. Tuttle that the testator was going to live up his dowry on the farm. After relating these facts, the witness stated that in his opinion the testator was of unsound mind.

Mrs. Emma M. Tuttle, wife of witness D. F. Tuttle, testified that she did the cooking and kept house at the Nute farm, and that the testator lived with them from 1925 to 1927. She testified that in her opinion the testator was of unsound mind, and based her opinion upon the following facts: That the testator's speech was not good; that she could not understand him at first, but later she could understand him much better; that often she had to coax him to eat; that at times he would get mad, wring his hands and cry, then say he was an old fool and should not act like that; that on two occasions he fired her husband and herself and afterwards rehired them; that he insisted on frequently sorting the hogs. It will be noted that the facts related by these two witnesses pertain to the years 1925 to 1927.

A number of witnesses testified that they were acquainted with the testator, but on several occasions he did not seem to recognize them. Other witnesses related incidents tending to prove peculiarities on the part of the testator. For example, one witness testified that testator was in the habit of taking a bath at seven o'clock every Saturday evening; that on one occasion he did not think of it until seven-thirty, then became angry and said it was too late and he would wait until the next Saturday. A witness, who was employed on the farm in the year 1924, testified that the testator often changed his mind about how he wanted the work done at the farm; that he would order him, the witness, to go from one job to another; that on one occasion the men were required to dig up the dirt in the barn lot and haul it out on the farm.

Other incidents were related, but they were not of any more serious consequences than those we have stated. We are not saying that

all those referred to could be called peculiarities. For example, a good farmer might well be of the opinion that hauling the dirt from the barnyard out on the farm was good husbandry. The fact that the testator, who was old and weak, attempted to separate the two bulls when they were fighting, may be evidence that he underestimated his ability, which, perhaps, many of us do, but such an act was entirely consistent with sanity.

Two doctors engaged in general practice at Harrisonville, Missouri, who never saw the testator, expressed an opinion that the testator was insane at the time the will was executed. Their opinion was based upon facts stated in a hypothetical question. The facts in this hypothetical question, for the most part, have been related. However, we are of the opinion that they were stated most unfavorable to the testator. For example, the question contained the following:

". . . that after he received the paralytic stroke in 1924, he was unable to attend to his brokerage business and lived on his said farm of 513 acres until about the year 1929 when he went to a small hotel in Strasburg, a small town without a water or sewerage system. . . ."

No witness testified that testator was unable to attend to his brokerage business because of any lack of mentality. In fact a number of witnesses testified that after the testator had received the paralytic stroke his advice was frequently sought by others engaged in a similar business. So far as the lack of modern conveniences at the hotel was concerned, the evidence justified the conclusion that the accommodations there were at least on a par with the conditions on the farm where the testator lived with the tenants. The change made was not any evidence of insanity. Plaintiff introduced a number of letters he had received, which had been written or dictated by the testator. These letters gave evidence that the testator was possessed of his mental faculties. For example, in January, 1928, he wrote the plaintiff, in his own handwriting, that in April of that year he was going to retire from business and take a trip east, also that at that time he would have about two hundred cattle ready for market. All of these predictions came true. He retired from business in April of that year, sold his cattle and took a trip east. All these facts were proven by the contestant in this case.

■■ We have related the most damaging evidence introduced by plaintiff. Some of it seems to us absurd and trifling. Taking the evidence of plaintiff's witnesses as a whole it is devoid of any substantial evidence tending to prove that the testator was not of sound mind. Plaintiff offered a number of witnesses who observed the testator during the time he lived at the hotel and a number of months prior to the execution of the will. Not one of these testified to any fact showing mental incapacity on the part of the testator, and they were not asked to express their opinion as to his mental soundness.

The law is well settled that lay witnesses must relate facts upon which they base their opinion that a person is of unsound mind, and unless the facts related are inconsistent with sanity the witnesses should not be permitted to express an opinion. Again, if such witnesses are permitted to express an opinion, the opinion thus expressed is worthless because not based upon facts inconsistent with sanity. Upon this question see the following authorities: Kaechelen v. Barringer (Mo.), 19 S. W. (2d) 1033, l. c. 1037 (8); State v. Soper, 148 Mo. 217, 49 S. W. 1007, l. c. 1010; Berkemeier v. Reller, 37 S. W. (2d) 430, l. c. 431, see, also, same case at 317 Mo. 614, 296 S. W. 739, l. c. 753; Fields v. Luck, 335 Mo. 765, 74 S. W. (2d) 35, l. c. 44 (9, 10); Loehr v. Starke (en banc), 332 Mo. 131, 56 S. W. (2d) 772, l. c. 775; Smarr v. Smarr, 319 Mo. 1153, 6 S. W. (2d) 860, l. c. 864 (9). In the latter case this court quoted with approval from 1 Wharton & Stille Medical Jurisprudence, section 990, as follows:

" 'Extreme old age, with its attendant physical and intellectual weakness, does not, of itself, incapacitate the testator, and therefore it raises no presumption of his not having a disposing mind. It follows that in this kind of insanity, as in all others, the exact subject of inquiry is the state of mind at the time of signing and executing the will.' "

In the case at bar plaintiff's evidence disclosed that the testator may have had a high temper; that he was extremely exacting in his dealings with his hired help on the farm; that he was unduly considerate about the care of his livestock; that due to a paralytic stroke his speech was affected; that he was old and had kidney and bladder trouble. However, there was no substantial evidence that his mind was affected. On the contrary, plaintiff's evidence disclosed that testator was capable and did look after his business affairs on the farm. The fact that the testator moved to the farm after receiving the stroke did not in any manner disclose insanity. The fact that his speech and right arm were affected, and that to a certain extent he had lost control of his bowel and kidney movements, may have created a desire on his part to be away from the busy surroundings of city life and thus save himself from embarrassments, which were but natural due to his condition.

Neither can any weight be given to the opinion of the two doctors, who, in answer to hypothetical questions, stated that the testator was of unsound mind. Into this question were placed all actions of the testator which seemed eccentric, or odd, isolated from their surroundings. The condition of his health was described most unfavorably. If an individual's sanity is to be determined upon an opinion expressed by a doctor who has never seen the individual, but who bases his opinion upon a hypothetical question containing only the seemingly eccentric and foolish things of the individual's life,

then indeed very few of us, if any, would be adjudged sane. The court ruled upon similar situations in a number of cases. In Winn v. Grier, 217 Mo. 420, l. c. 453, 117 S. W. 48, l. c. 57, this court quoted with approval the following, taken from Sayre v. Trustees of Princeton University, 192 Mo. 95, 90 S. W. 787:

" 'Medical men of great learning maintain that a mind diseased on one subject must be classed as unsound, but the law of this State is too well settled to be gainsaid that man's mind may be impaired in one faculty and practically unimpaired in all others. Derangement of mental faculties does not incapacitate one under our laws from making a will, if it does not render him unable to transact his ordinary business, and incapable of understanding the extent of his property and of appreciating the natural objects of his bounty. We have incorporated the principal hypothetical question propounded to the experts and it is apparent that many, if not all, of the facts assumed are entirely consistent with mental soundness. Those that tended in the least to show aberration were wholly detached from the more pertinent and important evidence, which completely negatived the evidence of eccentricity or any mental unsoundness. It did not include the principal and controlling facts, but we are not bound to accept an opinion based upon facts, which the law will not and does not recognize as showing a want of capacity to make a will. Conceding, as already said, that an expert might hold the view that Doctor Sayre was of unsound mind in some respects, the question and answer both fell short of the legal test of capacity to make a valid will in this State.' "

In the case before us the facts, as stated in the hypothetical question propounded to the doctors, including the ailments of the testator, were not inconsistent with sanity. The doctor who waited on and treated the testator for many years prior to his death, testified that his ailments did not in any manner affect the mind of the testator; that testator was mentally sound up until a few days before his death, when complications set in and he lapsed into a state of coma. Note this doctor's evidence:

"Q. Did you treat him before or after that. A. I treated him at the time of the stroke—that was the first time I had seen him.

"Q. Did you continue to observe him from that time on up—the effects of that stroke? A. Yes, sir.

"Q. I wish you would state to the jury what difficulty, if any, you observed as to whether or not that stroke affected him mentally or his mind in any way, or whether or not his mind was clear? A. The stroke merely affected his speech, but his speech improved considerably—at no time was his mentality deficient except the last few days of his illness—just before he died.

"Q. Tell the jury the condition you found, if any? A. You mean from the very beginning, is that the idea?

"Q. Yes, sir. A. When I first saw Mr. Nute he had had a cerebral thrombosis—by that I mean an involvement or a broken area of the brain.

"Q. What was that cerebral thrombosis? A. Thrombosis—in other words a stoppage of the vessel.

"Q. Stopped where? A. Stopped in what we call the middle cerebral—the Sylvian brain—at that time he had a stoppage there—that is on March 18th—he recovered from that stroke and he was able to get around and able to carry on business, but he was a little hard to understand, but there was in no way any involvement of his mentality. His last illness began on or about the 17th of September, 1931 and he died on September 27th, 1931 and his trouble at that time was a complication of things, bad heart, he had some arterial change, trouble with the prostate and infection of the bladder and kidneys.''

We, therefore, rule that contestants did not introduce any substantial evidence to support the charge that the testator was of unsound mind at the time of the execution of the will.

██ Neither did contestants introduce substantial evidence upon the charge of undue influence. This charge was made against Fry and Pringle, the residuary legatees, who were former partners of the testator. Fry had been an employee and partner of the testator for twenty-four years. Pringle had also been an employee and partner of testator. Pringle married testator's stepdaughter. It was shown that at testator's request Fry and Pringle attended to many details of his business. At the time the will was written the testator called Fry and Pringle and asked that his lawyer be brought to Strasburg for the purpose of preparing his will. Both Fry and Pringle were present at the time the will was executed. That the testator placed a great deal of confidence in both Fry and Pringle cannot be questioned. There was no evidence introduced tending to prove that this confidence, or trust, was not fully justified. A friendly relation continued between Fry, Pringle and the testator after the dissolution of the partnership. As also noted, the dissolution of the partnership had been planned for months prior thereto, as evidenced by the letter written by the testator to the plaintiff in January, 1928. The evidence wholly failed to show that either Fry or Pringle ever exercised any undue influence over the testator. In fact the evidence does not disclose that they could have so influenced him even if they had so desired. As one witness, testifying for the plaintiff, said: "He was a high-powered man." Another witness stated: "Well, he more or less had his own ideas about things, but they weren't always correct." The evidence upon the question of undue influence failed to show anything more than could have been expected under the circumstances. The testator was an old man. His speech was such, after receiving the paralytic stroke, that it was difficult for him to

make himself understood. His physical ailments were such that it was often embarrassing for him to be among people. Was it not then but natural that he should call upon his partners and associates to attend to the details of his business affairs? The evidence also failed to show that Fry and Pringle, as residuary legatees, would receive any substantial amount. Testator made specific bequests amounting to about $30,000. The inventory and appraisement of the estate, introduced in evidence by the plaintiff, showed the total value of the estate to be $30,481.72. Of this amount there was an item of $24,007.72 inventoried as being due from the firm of Fry & Pringle.

In 68 Corpus Juris, 1093, section 917, we read:

"To justify submission of the issue of undue influence to the jury, there must be evidence of probative force from which the jury could find that the will of the testator did not speak his real mind but spoke that of the person dominating him so that he was under an influence amounting to coercion, and evidence showing undue influence over the testator will not carry the issue to the jury unless it tends to show that such influence was a causative factor in the execution of the will."

See, also, Turner v. Anderson, 236 Mo. 523, 139 S. W. 180, l. c. 184 (1), where this court said:

"Conceding to plaintiff that the mind of testator was weakened by the ravages of disease, and that a weakened mind may be more easily influenced than a strong one, precisely as the wind that bends a willow or breaks a weakling spends itself harmlessly upon the oak, yet, to break a will for undue influence, there must be evidence of substance tending to show that the influence of another was operative and undue in order to make the paper writing, presented for solemn probate as a will, the will of another, and not that of testator. The proof of influence, alone, is not sufficient. It must be *undue*."

Numerous cases could be cited in support of the rule above stated. This, however, under the facts proven in this case, is unnecessary. The evidence wholly failed to make an issue for the jury on the question of the testator's mental incapacity, or on the question of the exercise of undue influence, as charged in the petition.

The judgment is, therefore, reversed and the cause remanded to the trial court, with directions to permit proponents of the will to prove the will in solemn form. *Cooley* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.